## DE ARNAUD *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 550. Submitted January 8, 1894. — Decided January 29, 1894.·

A receipt signed by a claimant against the United States for a sum less than he had claimed, paid him by the disbursing agent of a department, "in full for the above account," is, in the absence of allegation and evidence that it was given in ignorance of its purport, or in circumstances constituting duress, an acquittance in bar of any further demand.

A claim against the United States whose prosecution in the Court of Claims was barred by the statute of limitations, was presented to the Treasury for adjustment and payment. The Secretary of the Treasury transmitted it to the Court of Claims under the provisions of Rev. Stat. § 1063. *Held,* that it was barred by the statute of limitations.

THIS was an appeal from a judgment of the Court of Claims, dismissing the petition of Charles de Arnaud, in which he sought for a judgment in his favor against the United States for the sum of $100,000, for services the petitioner alleged he had rendered as a "military expert," employed for "special and important duties," by General Fremont for and on behalf of the United States.

The facts of the case, as found by the court below, were as follows:·

The claimant is a native subject of Russia, residing in the United States. , The following is a translation of the provisions of the law of Russia, according to citizens of the United States the right to prosecute claims against such government in its courts :

" Sec. 1292. The decision of the court is announced to both parties according to general rules, but independently thereof a copy of the decision is forwarded to the local government the institution spoken of in section 2084. .

" Sec. 1296. In the execution of a judgment against a government institution the claimant presents a certified abstract of the decision to the institution, which is bound to execute the judgment accordingly.

" Sec. 1519. Aliens residing in Russia are subject to Russian laws, as well personally as in regard to property, and enjoy. the common defence of safeguards and protection thereof. '

" Sec. 1288. Claims of private persons against the government institutions are governed by general rules, and are brought according to the location of the property or according to the place where the loss was sustained by the private person, or according to the place where the government institution or where the government officer is situated or resides who represents the government in court."

The claimant came to this country about the year 1860, and was, prior to that time, an officer in the Russian army, where he served in the Crimean war as lieutenant of engineers, and was serving as such when the armistice was concluded between Russia and the contending allies.

In the year 1861 John C. Fremont was a major-general in the United States Army, in command of the Western Department of Missouri. In the month of August, 1861, he entered into an agreement with the claimant, by which the claimant was employed by him to go within the Confederate lines, make observations of the country in the States of Kentucky, Tennessee, and Missouri, to observe the position of the rebel forces, the strategic positions occupied by them, and advise him (General Fremont) of the movements necessary to be made by the Union forces to counteract the movements of the enemy,

and to facilitate the advance of our troops and aid them in attacking and repulsing the Confederate forces.

In consequence of that arrangement he did go within the Confederate lines, and, agreeably to what he was instructed to do, brought back to General Fremont full information of the kind desired, maps of the country, of various roads, the number of troops, their stations, condition, and, as far as he could judge and find out, their projected movements.

He was absent on that business a number of days, came back, and reported in St. Louis about the 12th of August, 1861, to General Fremont, who was so satisfied with the information that he brought, with the intelligence and sagacity he displayed in collecting it, and the usefulness of his information, that he (Fremont) then made an arrangement for him to continue in the service of the department. About the 12th of the month of August, 1861, he again left for the country occupied by the Confederate forces to collect information. The most important part of the services rendered by him was in the beginning of the next month, September, when, with the information that he had collected, he was returning to report to General Fremont a movement of the Confederate forces upon Paducah. On reaching Cairo he found that he had only time to report to Fremont by telegraph, and reported forthwith personally to General Grant, informing him that troops were advancing upon Paducah, and that it was necessary to move immediately in order to occupy the place. General Grant did move instantly and took possession of Paducah, Kentucky, solely on information given by the claimant, and to the effect that the rebels were moving upon that city with a large force.

The claimant was paid $600 on the following orders and receipts:

"HEADQUARTERS WESTERN DEPARTMENT,

"CAMP NEAR JEFFERSON CITY, *Oct.* 6, 1861.

"Major PHINNEY, U. S. A., Paymaster, etc. :

"Will pay to Charles de Arnaud the sum of three hundred dollars ($300) for secret service. J. C. FREMONT,

"*Major General.*"

"Received, Warsaw, Mo., October 23, 1861, of Major Jas. H. Phinney, paymaster U. S. A., the sum of three hundred ($300) 'for account of secret service rendered to the U. States' by special order of Major-Gen'l Fremont, dated near Warsaw, Mo., Oct. 23, 1861.                    CHAS. DE ARNAUD."

"IN THE FIELD,

"HEADQUARTERS WESTERN DEPARTMENT, *Oct.* 23, 1861.

"Major Phinney will pay to the bearer, Mr. Charles de Arnaud, three hundred dollars for secret service to the United States.                    J. C. FREMONT,

"*Major General Comm'n'd'g.*"

"Received, Jefferson City, October 6, 1861, from Major J. H. Phinney, three hundred dollars for secret service, as per special order of Major-Gen'l J. C. Fremont of this date. $300.

"(Signed duplicate)               CHAS. DE ARNAUD."

On January 6, 1862, the claimant presented his claim to the War Department, and it was reported upon by the quartermaster as follows:

"No. 22. — The United States to Charles de Arnaud, Dr.

"January 6, 1862. — For special services rendered to United States government in traveling through the rebel parts of Kentucky, Tennessee, etc., and procuring information concerning the enemy's movements, etc., which led to successful results (as per certificate hereunto appended), $3600.

"Q. M. GEN'L'S OFFICE, 9*th Jan'y,* 1862.

"In view of the certificate of Gen. Grant of 30th Nov. and the more general certificate of Maj.-Gen. Fremont of 2d Jan'y, herewith, covering all of Mr. Arnaud's services, the sum of thirty-six hundred dollars appears to me to be a not unreasonable compensation. I state this at Mr. Arnaud's earnest request.                    M. C. MEIGS,

"*Q. M. Gen'l.*"

On the 13th of January the claimant went to President Lincoln and laid before him his claim with the following letters :

"CAIRO, ILL., *January* 6, 1862.

"Hon. A. LINCOLN, President U. S. A. :

"The bearer, Charles de Arnaud, has to my knowledge rendered important services to the government. He, at the risk of his life, gave information which led to our capture of Paducah, Ky., in advance of the rebels ; thereby he saved the country thousands of lives and millions of dollars. I fully indorse his certificate of Maj. Gen. J. C. Fremont. He is entitled to the largest remuneration the government pays for such services.

"Respectfully, etc.,                    A. H. FOOTE,
                                         "*Flag Officer.*"

"HEADQUARTERS DISTRICT SOUTHEAST MISSOURI,
                       "CAIRO, *November* 31, 1861.

"CHAS. DE ARNAUD :

"SIR : In reply to your request, and the note from Major-General Halleck presented me by yourself, I can state I took possession of Paducah, Ky., solely on information given by yourself, and to the effect that the rebels were marching upon that city with a large force. This information I afterwards had reason to believe was fully verified : First, because as we approached the city secession flags were flying and the citizens seemed much disappointed that Southern troops expected by them were not in advance of us. It was understood that they would arrive that day. I also understood afterwards that a force of some four thousand Confederate troops were actually on their way for Paducah when taken possession of by my order. A point through which many valuable supplies were obtained for the Southern army was cut off by this move, and a large quantity of provisions, leather, etc., supposed to be for the use of the Southern army, captured. For the value and use to which these were put I refer you to

General Paine, whom I left in command. Only remaining in Paducah a few hours, and being busily engaged with other matters during that time, I can make no estimate of the cash value of the stores captured.

"Yours, etc.,          U. S. GRANT, *Brig. Gen.*"

"ASTOR HOUSE, NEW YORK, *January* 2, 1862.

"This is to certify that Mr. Charles de Arnaud was employed by me from about the first of August in traveling throughout the rebel parts of Tennessee and Kentucky, with the object of ascertaining the strength, condition, and probable movements of the rebel forces. He made under my directions many such journeys, reporting fully and in detail upon the force of the various encampments and the condition and strength of garrisons and various works in Tennessee and along the Mississippi River. He obtained this information at much personal risk and with singular intelligence, and performed the duties entrusted to him entirely to my satisfaction. He continued on this duty until the termination of my command in the western department. His services were valuable to the government, and I consider entitled to the largest consideration that the government allows in such cases or to such agents.          J. C. FREMONT,
" *Maj. Gen'l, U. S. A.*"

President Lincoln folded the letters together and wrote on the back of General Grant's letter the following:

" I have no time to investigate this claim; but I desire the accounting officers to investigate it, and if it be found just and equitable to pay it, notwithstanding any want of technical legality or form.

"Jan. 13, 1862.          A. LINCOLN."

Thereafter, on the next day, January 14, the Secretary of War made the following endorsement on said claim:

"I have considered this claim, and cannot bring my mind to the conclusion that the sum charged is not exorbitant. I

am willing to allow $2000 in full of the claim, and the dis. clerk, War Dep't, is authorized to pay Charles de Arnaud that sum.

"War Dept., Jan'y 14, 1862.

"SIMON CAMERON, *Sec. War.*"

The claimant was thereupon paid, under protest, by said disbursing clerk of the War Department, out of appropriation for "contingencies of the army," $2000, and gave the following receipt:

"The United States to Charles de Arnaud, Dr.

"JANUARY 14, 1862.

"For services and expenses as special agent of the gov't, $2000.

"Received, Washington, January 21, 1862, from John Potts, disbursing clerk for the War Department, two thousand dollars, in full, for the above account.    CHAS. DE ARNAUD."

At the time of giving the receipt in full, January 14, 1862, he was not in a state of dementia, and was able to comprehend the terms of the receipt; but the effects of his wounds in the head were beginning to affect him mentally, and he was in a condition of nervous apprehension, and naturally desirous of securing his personal safety by getting out of the country, and he accepted the money paid by the War Department in order that he might do so.

While engaged in the military service of the government, as aforesaid, he received a wound in his head in the fall of 1861, from which afterwards, in the same year, he became insane, and did not recover prior to February, 1886.

About September 4, 1886, the claimant presented his claim to the Treasury Department, without naming the specific amount claimed, but incidentally claimed $50,000, because he was told by General Fremont that during the Mexican war one McGoffin, a secret agent, had been paid that sum. The Auditor reported to the Second Comptroller as follows:

"Act of July 17, 1861, appropriated $200,000 'for contingencies of the army' (12 Statutes, 263).

"This claim was paid out of above fund.

"Accounting officers have no jurisdiction to open up a settlement made by War Dep't from secret service fund and determine unliquidated damages."

The Second Comptroller made the following endorsement thereon:

"JUNE 29, 1888.

"The within recommendation is approved. De Arnaud seems to have rendered unmistakably valuable services as a secret agent, and there appears to have been provision made for the payment of services of that nature. But this claim must be rejected pursuant to the recommendation of the 2nd Auditor, because payment in full seems to have been made and accepted years ago, and because this office has no means or jurisdiction to consider so plain a case of unliquidated damages.

"That the officer was not paid commensurately with his services, and deserves recognition at the hands of Congress, seems to be amply evidenced by President Lincoln's memorandum and by the testimony of Generals Grant and Fremont.

"SIGOURNEY BUTLER.

"2nd Comptroller."

The claimant was informed of the action of the Comptroller by the following letter:

"WASHINGTON, D. C., July 10, 1888.

"Captain CHARLES DE ARNAUD, Washington, D. C.:

"SIR: I have the honor to inform you that your claim for compensation for services as a military expert in 1861 has been disallowed by the Second Comptroller, without prejudice, because payment in full seems to have been made and accepted years ago, and because the accounting officers have no means or jurisdiction to consider so plain a case of unliquidated damages. . . . WILLIAM A. DAY, Auditor."

On the 20th of October, 1888, the claimant renewed his application to the Treasury Department, and asked that the case be referred to the Court of Claims. This communication was endorsed by the Second Comptroller as follows:

"JANUARY 9th, 1889.

"Respectfully referred to the Second Auditor.

"The application of the claimant, Charles de Arnaud, seems to have merit. This case is plainly beyond the jurisdiction of the accounting officers, but it bears upon its face distinct marks that should give it a fuller consideration than can be accorded by the accounting officers. Furthermore, there is no adequate machinery in the accounting officers for properly sifting the very extraordinary evidence in this case. This can only be done by the Court of Claims.

"With your reply, which the claimant asks be made special, stating your views on this case, please forward all the papers pertinent thereto. SIGOURNEY BUTLER, *Comptroller.*"

On January 12, 1889, the Second Auditor transmitted all the papers on file in his office to the Second Comptroller, stating that his views had been fully expressed in previous communications hereinbefore set out. The Comptroller made a recommendation to the Secretary of the Treasury that the case be transmitted to the Court of Claims, which was accordingly done by the following letter of transmission.:

"TREASURY DEPARTMENT, OFFICE OF THE SECRETARY,

"WASHINGTON, D. C., *January* 25, 1889.

"To the honorable the Chief Justice and judges of the Court of Claims.:

"Under the provisions of section 1063 of the Revised Statutes of the United States I transmit herewith to your honorable court, upon the recommendation and certificate of the Second Comptroller, the claim of Charles de Arnaud for services as military expert, now pending in the department and involving disputed facts and controverted questions of law,

with all the vouchers, papers, and documents pertaining to said claim, for trial and adjudication by your honorable court, as provided by law.

    "Respectfully yours,       HUGH S. THOMPSON,
                               "*Acting Secretary.*"

*Mr. H. O. Claughton* and *Mr. Horatio J. Lauck* for appellant.

*Mr. Assistant Attorney General Dodge* and *Mr. Conway Robinson* for appellees.

MR. JUSTICE SHIRAS delivered the opinion of the court.

The court below, passing by other grounds of defence, dismissed the petition upon the proposition that it disclosed a case within the ruling of this court in the case of *Totten, Administrator,* v. *United States,* 92 U. S. 105.

That was a case where one Lloyd asserted that, under a contract with President Lincoln, he was to proceed South and ascertain the number of troops stationed at different points in the insurrectionary States, procure plans of forts, and gain such other information as might be beneficial to the government of the United States, and report the facts to the President; for which services he was to be paid $200 a month.

The Court of Claims found that Lloyd had performed the services mentioned, but the members of that court being equally divided in opinion as to the authority of the President to bind the United States by the contract in question, the court decided against the claim and dismissed the petition.

On appeal, this court found no difficulty as to the authority of the President in the matter. As commander-in-chief of the armies of the United States he was undoubtedly authorized to employ secret agents to enter the rebel lines and obtain information respecting the strength and movements of the enemy; and it was also said that contracts to compensate such agents are so far binding upon the government as to render it lawful for the President to direct payment of the amount stipulated out of the contingent fund under his control.

But the court was of opinion that the service stipulated for in the contract was a secret service; the information sought was to be obtained clandestinely, and was to be communicated privately; the employment and the service were to be equally concealed. And the court held that a secret service, with liability to publicity in a suit subsequently brought against the government, would be impossible; that, as such services are sometimes indispensable to the government, its agents in those services must look for their compensation to the contingent fund of the department employing them, and to such allowance from it as those who dispense that fund may award; that the secrecy which such contracts impose precludes any action for their enforcement; that the publicity produced by an action would itself be a breach of a contract of that kind, and thus defeat a recovery.

The counsel of the appellant do not impugn the doctrine of the *Totten* case, but they contend that the Court of Claims erred, in the present case, in treating the contract and services of Arnaud as being of a character that brings the case within such doctrine. It is denied that Arnaud's functions were those of a spy, but were those of a "military expert."

If it were necessary for us to enter into the question thus suggested, it might be difficult for us to point out any substantial difference in character between the services rendered by Lloyd and those rendered by Arnaud; but the record discloses other defences so plainly applicable that we are relieved from considering whether the new-fangled term "military expert" is only old "spy," "writ large."

On January 6, 1862, after the claimant had performed all the services described in his petition, he presented a claim to the War Department, in the following form:

"No. 22. — The United States to Charles de Arnaud, Dr.

"JANUARY 6, 1862.

"For special services rendered the United States government in traveling through the rebel parts of Kentucky, Tennessee, etc., and procuring information concerning the enemy's

movements, etc., which led to successful results, (as per cer tificate hereto appended,) $3600.".

On this claim the Quartermaster General, on January 9, 1862, endorsed the following:

"In view of the certificate of General Grant of 30th Nov. and the more general certificate of Major-General Fremont, of 2d January, herewith, covering all Mr. Arnaud's services, the sum of thirty-six hundred dollars appears to me a not unreasonable compensation. I state this at Mr. Arnaud's earnest request.

            "M. C. MEIGS, *Q. M. Gen'l.*"

Thereafter, on January 14, 1862, the Secretary of War made the following endorsement on said claim:

"I have considered this claim, and cannot bring my mind to the conclusion that the sum charged is not exorbitant. I am willing to allow $2000 in full of the claim, and the dis. clerk, War Depart. is authorized to pay Charles de Arnaud that sum.

            "SIMON CAMERON, *Sec. War.*"

The claimant was thereupon paid by said disbursing clerk of the War Department $2000, and gave the following receipt:

"The United States to Charles de Arnaud, Dr.

            "JANUARY 14, 1862.

"For services and expenses as special agent of the gov't, $2000.

"Received, Washington, January 21, 1862, from John Potts, disbursing clerk for the War Department, two thousand dollars, in full, for the above account.     CHAS. DE ARNAUD."

In the absence of allegation and evidence that this receipt was given in ignorance of its purport, or in circumstances constituting duress, it must be regarded as an acquittance in bar of any further demand. *Baker* v. *Nachtrieb*, 19 How. 126; *United States* v. *Childs*, 12 Wall. 232, 243.

No further or other claim was made by the petitioner until September 4, 1886 — a period of twenty-four years. Even, therefore, if the claimant was not effectually barred by his voluntary acquittance, his claim was assuredly barred by the statute of limitations, which provides that every claim against the United States, cognizable by the Court of Claims, shall be forever barred unless the petition, setting forth a statement thereof, is filed in the court, or transmitted to it by the Secretary of the Senate or the Clerk of the House of Representatives, as provided by law, within six years after the claim first accrues. Rev. Stat. § 1069.

In *Finn's case*, in many respects resembling the present one, this court construed and applied that statute in the following terms:

"In any view this claim belonged to the class which, under the express words of the act of 1863, Rev. Stat. § 1069, were 'forever barred,' so far, at least, as the claimant had the right to a judgment in that court against the United States. The duty of the court, under such circumstances, whether limitation was pleaded or not, was to dismiss the petition; for the statute, in our opinion, makes it a condition or qualification of the right to a judgment against the United States that — except where the claimant labors under some one of the disabilities specified in the statute — the claim must be put in suit by the voluntary action of the claimant, or be presented to the proper department for settlement, within six years after suit could be commenced thereon against the government. Under the appellant's theory of the case the Second Comptroller could open the case twenty years hence, and upon the claim being transmitted by the Secretary of the Treasury to the Court of Claims, that court could give judgment upon it against the United States. We do not assent to any such interpretation of the statute defining the powers of that court.

"The general rule that limitation does not operate by its own force as a bar, but is a defence, and that the party making such a defence must plead the statute if he wishes the benefit of its provisions, has no application to suits in the Court of Claims against the United States. An individual may waive

such a defence, either expressly or by failing to plead the statute, but the government has not expressly or by implication conferred authority upon any of its officers to waive the limitation imposed by the statute upon suits against the United States in the Court of Claims." *Finn* v. *United States*, 123 U. S. 227, 232, 233.

The claimant cannot avail himself of the saving clause in the statute suspending its operation in favor of idiots, lunatics, insane persons, and persons beyond the seas, because such suspension is only in favor of those laboring under the specified disabilities at the time the claim accrued; and it is conceded that plaintiff's mental incapacity did not begin until after his claim had accrued.

Nor can it be successfully claimed that a disability subsequently arising would suspend the operation of the statute. See *Bauserman* v. *Blunt*, 147 U. S. 647, and cases therein cited.

In no view that we can take of this case can we find any just foundation for a claim against the government, and the judgment of the court below, dismissing the claimant's petition, is accordingly

*Affirmed.*