## UNITED STATES *v.* NEW YORK.

## NEW YORK *v.* UNITED STATES.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 45, 186. Argued October 17, 18, 1895.—Decided January 6, 1896.

Any claim made against an Executive Department, "involving disputed facts or controverted questions of law, where the amount in controversy exceeds three thousand dollars, or where the decision will affect a class of cases, or furnish a precedent for the future action of any Executive Department in the adjustment of a class of cases, without regard to the amount involved in the particular case, or where any authority, right, privilege or exemption is claimed or denied under the Constitution of the United States," may be transmitted to the Court of Claims by the head of such Department under Rev. Stat., § 1063, for final adjudication; provided, such claim be not barred by limitation, and be one of which, by reason of its subject-matter and character, that court could take judicial cognizance at the voluntary suit of the claimant.

Any claim embraced by Rev. Stat., § 1063, without regard to its amount, and

Counsel for the State of New York.

whether the claimant consents or not; may be transmitted under the act of March 3, 1883, c. 116, to the Court of Claims by the head of the Executive Department in which it is pending, for a report to such Department of facts and conclusions of law for " its guidance and action."

Any claim embraced by that section may, in the discretion of the Executive Department in which it is pending, and with the expressed consent of the plaintiff, be transmitted to the Court of Claims, under the act of March 3, 1887, c. 359, without regard to the amount involved, for a report, merely advisory in its character, of facts or conclusions of law.

In every case, involving a claim of money, transmitted by the head of an Executive Department to the Court of Claims under the act of March 3, 1883, c. 116, a final judgment or decree may be rendered when it appears to the satisfaction of the court, upon the facts established, that the case is one of which the court, at the time such claim was filed in the Department, could have taken jurisdiction, at the voluntary suit of the claimant, for purposes of final adjudication.

Whether the words " or matter " in the second section of that act embrace any matters, except those involving the payment of money, and of which the Court of Claims under the statutes regulating its jurisdiction could, at the voluntary suit of the claimant, take cognizance for purposes of final judgment or decree, is not considered.

As the claim of the State of New York, the subject of controversy in this case, was presented to the Treasury Department before it was barred by limitation, its transmission by the Secretary of the Treasury to the Court of Claims for adjudication was only a continuation of the original proceeding commenced in that Department in 1862; and the delay by the Department in disposing of the matter before the expiration of six years after the cause of action accrued, could not impair the rights of the State.

The $91,320.84 paid by the State of New York for interest upon its bonds issued in 1861 to defray the expenses to be incurred in raising troops for the national defence was a principal sum which the United States agreed to pay, and not interest within the meaning of the rule prohibiting the allowance of interest accruing upon claims against the United States prior to the rendition of judgment thereon.

The claim of the State of New York for money paid on account of interest to the commissioners of the Canal Fund, is not one against the United States for interest as such, but is a claim for costs, charges and expenses properly incurred and paid by the State in aid of the general government, and is embraced by the act of Congress declaring that the States would be indemnified by the general government for money so expended.

THE case is stated in the opinion.

*Mr. David B. Hill* for the State of New York.  *Mr. T.*

*E. Hancock*, Attorney General of the State of New York, was on his brief.

*Mr. Assistant Attorney General Whitney* for the United States. *Mr. Assistant Attorney General Dodge* was on the brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

On the 3d day of January, 1889, the Secretary of the Treasury transmitted to the Court of Claims all the papers and vouchers relating to a claim of the State of New York against the United States, then pending in the Treasury Department, for interest paid on money borrowed and expended in enrolling, subsisting, clothing, supplying, arming, and equipping troops for the suppression of the rebellion of 1861. That claim, the Secretary certified, involved controverted questions of law, and exceeded three thousand dollars in amount. The communication accompanying the papers stated that the case was transmitted to the Court of Claims under and by authority of section 1063 of the Revised Statutes, to be there proceeded in according to law.

In further prosecution of this claim, the State promptly filed its petition in the court below and asked judgment against the United States for the sum of $131,188.02 with interest from the first day of July, 1862, together with such other relief as would be in conformity with law.

This claim was based on the act of Congress of July 27, 1861, c. 21, providing that "the Secretary of the Treasury be, and he is hereby directed, out of any money in the Treasury not otherwise appropriated, to pay to the Governor of any State, or to his duly authorized agents, the costs, charges, and expenses properly incurred by such State for enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting its troops employed in aiding to suppress the present insurrection against the United States, to be settled upon proper vouchers to be filed and passed upon by the proper accounting officers of the Treasury." 12 Stat. 276.

By a joint resolution of Congress, approved March 8, 1862,

it was declared that the above act should be construed "to apply to expenses incurred as well after as before the date of the approval thereof." 12 Stat. 615.

Before July 4, 1861, the State of New York — pursuant to a statute passed by its legislature April 15, 1861, c. 277 — enlisted, enrolled, armed, equipped, and caused to be mustered into the military service of the United States for the period of two years or during the war thirty thousand troops to be employed in suppressing the rebellion. That statute provided that all expenditures for arms, supplies or equipments necessary for such forces should be made under the direction of the Governor and other named officers, and that the moneys therefor should, on the certificate of the Governor, be drawn from the treasury on the warrant of the comptroller in favor of such person or persons as from time to time were designated by the Governor; and the sum of $3,000,000, or so much thereof as was necessary, was appropriated out of any moneys in the treasury not otherwise appropriated to defray the expenses authorized by that act, or any other expenses of mustering the militia of the State or any part thereof into the service of the United States. That act also imposed, for the fiscal year commencing on the 1st day of October, 1861, a state tax to meet the expenses authorized, not to exceed two mills on each dollar of the valuation of real and personal property in the State. Laws of N. Y. 84th Session, 1861, page 634.

There was no money in the treasury of the State in 1861 that had not been specifically appropriated for the expenses of the state government; none that could have been used to defray the expenses of enlisting, enrolling, arming, equipping, and mustering troops into the service of the United States.

Under the laws of the State the moneys authorized to be raised by the act of April 15, 1861, did not reach the state treasury and were not available for use until the months of April and May, 1862.

The total state tax rate fixed at the session of the legislature beginning on the first Tuesday in January, 1861, was $3\frac{1}{8}$ mills, of which $1\frac{1}{2}$ mills was the amount authorized by the above

statute of 1861. The moneys realized from this tax were paid into the state treasury during the year 1862.

The State had no other means of raising the money required for the purpose of immediately defraying the expenses of enlisting, enrolling, arming, equipping, and mustering in such troops, except by borrowing money in anticipation of the collection of its taxes; and between June 3, 1861, and July 2, 1861, in order to provide for the public defence, it issued bonds in anticipation of such taxes to the amount of $1,250,000, payable on July 1, 1862, except that $100,000 was made payable June 1, 1862, at the rate of seven per cent per annum, which at that time was the legal rate of interest under the laws of the State.

The issuing of these bonds was necessary for the purpose of providing the money required, and upon their sale the full amount of their face value was received and was used and applied by the State, together with other moneys, in raising troops. The entire sum so expended between the 23d day of April, 1861, and the 1st day of January, 1862, was $2,873,501.19 exclusive of interest upon the bonds or loans made by the State for that purpose.

In addition to the above sums, the State during the years 1861 and 1862 paid, on account of interest that accrued on its bonds issued in anticipation of the tax for the public defence, the sum of $91,320.84.

By a statute of New York of April 12, 1862, the legislature specifically appropriated the sum of $1,250,000 for the redemption of comptroller's bonds issued for loans in anticipation of the tax imposed by the act of April 15, 1861, c. 192, and the additional sum of $91,320.84 for the payment of the accruing interest on those bonds. Laws of N. Y. 1862, 85th Session, 364.

Of the remainder, of the above sum of $2,873,501.19 necessarily expended by the State of New York for the purpose stated, between April 23, 1861, and January 1, 1862, after deducting the amount of $1,250,000 raised by issuing bonds, $1,623,501.19 was taken from the Canal Fund of the State. That Fund, under the constitution of the State, was a Sinking

Fund for the ultimate payment of what is known as the canal debt. Const. N. Y. 1846, Art. VII, Sec. 1.

Under the tax rate of 1860 there had been levied and collected and paid into the treasury of the State the sum of $2,039,663.06 for the benefit of and to the credit of the Canal Fund. That sum reached the state treasury in April and May, 1861, subject to be invested by the state officers pursuant to the requirements of law and the constitution of the State, in securities for the benefit of the Canal Fund. On May 21, 1861, the lieutenant governor, comptroller, treasurer, and the attorney general, constituting the commissioners of the Canal Fund, authorized the comptroller to use $2,000,000 of the Canal Fund moneys for military purposes until the 1st of October next, and $1,000,000 until the 1st day of January, 1862, at five per cent ; and of this amount the sum of $1,623,501.19 was used by the comptroller for the purpose of defraying the expenses of raising and equipping such troops. The following was the order : " State of New York, Canal Department, Albany, May 21, 1861. The comptroller is to be permitted to use two millions of dollars of the Canal Fund moneys for military purposes until the first day of October next, when the commissioners of the Canal Fund will invest one million of dollars of the Canal Sinking Fund under section 1, article VII, in the tax levied for military purposes until the 1st of July, 1862, at five per cent, and the comptroller may use one million of dollars of the tax levied to pay interest on the $12,000,000 debt until the 1st of January, 1862, when the commissioners will, if they have the means, replace that or as large an amount as they may have the means to do it with from the toll of the next fiscal year, so as that the whole advance from the Canal Fund on account of the tax be two millions of dollars. It is understood the comptroller will retain the taxes now in process of collection for canal purposes until the above investments are made, paying the funds five per cent interest therefor." This order was signed by the commissioners of the Canal Fund.

On December 28, 29, and 31, 1861, the United States repaid to the State, on account of moneys so expended by the latter,

the sum of $1,113,000 which sum with interest was placed in the Canal Fund on April 4, 1862. This left $510,501.19 unpaid of the moneys used from the Canal Fund.

The amount of interest at 5 per cent. per annum on the moneys of the Canal Fund during the time it was used by the State in raising troops was $48,187.13. But during the same time the State had received interest on portions of those moneys, while it was lying in bank unused, to the amount of $8319.95, and the net deficiency of the State on account of interest on such moneys during the period when they were so used was $39,867.18, which sum was paid into the Canal Fund from the state treasury.

The total amount paid by the State for interest upon its bonds issued in anticipation of the tax for the public defence, and upon the moneys of the Canal Fund used for the purpose of defraying the expenses of raising and equipping troops, was $131,188.02. No part of that sum has been paid by the United States.

The moneys above specified as actually expended by the State of New York were necessarily expended for the purpose of enlisting, enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting such troops and causing them to be mustered into the military service of the United States, and were so paid and expended at the request of the civil and military authorities of the United States.

Prior to January 3, 1889, the State had presented, from time to time, various claims and accounts to the Treasury Department of the United States for charges and expenses incurred by it in enlisting, enrolling, arming, equipping, and mustering troops into the military service of the United States. Those claims amounted in the aggregate to $2,950,479.46, and included charges for all the moneys paid and placed as hereinbefore specified. The department, from time to time, allowed thereon various sums aggregating $2,775,915.24, leaving a balance of $174,564.22 not allowed, and the claims for which were pending in the Department unadjusted when this case was transmitted to the Court of Claims on the 3d day of January, 1889. Of that sum of $174,564.22 the sums

hereinbefore specified, amounting to $131,188.02, constituted a part.

The claim of the State for expenditures in furnishing troops with clothing and munitions of war was filed in the Treasury Department in May, 1862, and included the above items of interest. The claim for interest has from that time been suspended in the Department, and was so suspended at the time it was transmitted to the Court of Claims.

The court, after finding the facts substantially as above stated, gave judgment in favor of the State for $91,320.84, on account of interest paid upon its bonds issued in anticipation of taxes imposed for the public defence. From that judgment the United States appealed. The State also appealed, and claims that it was entitled to judgment for the additional sum of $39,867.13 paid into what is called the Canal Fund as interest upon the moneys it had borrowed from that fund to be repaid with interest.

The Government moved to dismiss the State's appeal, its contention being that the judgment brought here by the State for review is not obligatory in character and appealable, but only ancillary and advisory. This motion assumes that the court below was without jurisdiction under existing legislative enactments to render a final judgment, reviewable by this court, upon any claim, whatever its amount, made against an Executive Department and transmitted to the Court of Claims to be there proceeded in according to law.

We recognize the importance of the question thus presented, and have bestowed upon it the most careful consideration. Its solution can be satisfactorily reached only by an examination of the various statutes regulating the jurisdiction of the Court of Claims, including those known as the Bowman act of March 3, 1883, c. 116, 22 Stat. 485, and the Tucker act of March 3, 1887, c. 359, 24 Stat. 505.

By the act of Congress of July 27, 1861, c. 21, the Secretary of the Treasury was directed, out of any money in the Treasury not otherwise appropriated, and upon vouchers to be passed upon by the accounting officers of that Department, to pay the

costs, charges, and expenses properly incurred by any State in enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting its troops to be employed in suppressing the rebellion of 1861. 12 Stat. 276.

The claim of New York was founded on the above act of Congress of July 27, 1861, if not on contract with the United States. It was transmitted by the Secretary of the Treasury to the Court of Claims under section 1063 of the Revised Statutes as one involving controverted questions of law.

By the act of June 25, 1868, c. 71, § 7, the jurisdiction of the Court of Claims was enlarged so as to embrace several classes of claims that might be transmitted to it by the head of an Executive Department for adjudication. 15 Stat. 75, 76.

The provisions of that act were preserved in section 1063 of the Revised Statutes which is as follows : " Sec. 1063. Whenever any claim is made against any Executive Department, involving disputed facts or controverted questions of law, where the amount in controversy exceeds three thousand dollars, or where the decision will affect a class of cases, or furnish a precedent for the future action of any Executive Department in the adjustment of a class of cases, without regard to the amount involved in the particular case, or where any authority, right, privilege, or exemption is claimed or denied under the Constitution of the United States, the head of such Department may cause such claim, with all the vouchers, papers, proofs, and documents pertaining thereto, to be transmitted to the Court of Claims, and the same shall be there proceeded in as if originally commenced by the voluntary action of the claimant ; and the Secretary of the Treasury may, upon the certificate of any Auditor or Comptroller of the Treasury, direct any account, matter, or claim, of the character, amount, or class described in this section, to be transmitted, with all the vouchers, papers, documents, and proofs pertaining thereto, to the said court, for trial and adjudication: *Provided,* That no case shall be referred by any head of a Department unless it belongs to one of the several classes of cases which, by reason of the subject-matter and character,

the said court might, under existing laws, take jurisdiction of on such voluntary action of the claimant."

It is clear that under this section no claim against an Executive Department, not otherwise described than as one "involving disputed facts or controverted questions of law," could be transmitted to the Court of Claims for adjudication unless the amount in controversy exceeded three thousand dollars. It is equally clear that that section did not make the amount jurisdictional where a claim of that class is transmitted as one the decision of which would affect a class of cases, or furnish a precedent for the action of the Executive Department in adjusting a class of cases, nor where any authority, right, privilege, or exemption was claimed or denied under the Constitution of the United States. But, as bearing on the inquiry to be presently made whether that section was superseded by subsequent enactments, it should be here noted that there might be claims in the hands of an Auditor or of the Comptroller of the Treasury for examination, which in the first instance were to be passed on by some other Department than that of the Treasury. Claims of that special class could not be transmitted by the Secretary of the Treasury to the Court of Claims, under section 1063 of the Revised Statutes, for adjudication, except " upon the certificate of the Auditor or Comptroller of the Treasury," having it under examination. This is indicated not only by the words of that section, but by sections 1064 and 1065, the first of which sections provides that " all cases transmitted by the head of any Department, *or* upon the certificate of any Auditor or Comptroller, according to the provisions of the preceding section, shall be proceeded in as other cases pending in the Court of Claims, and shall, in all respects, be subject to the same rules and regulations ; " and the latter, that " the amount of any final judgment or decree rendered in favor of the claimant, in any case transmitted to the Court of Claims under the two preceding sections, shall be paid out of any specific appropriation applicable to the case, if any such there be ; and where no such appropriation exists, the judgment or decree shall be paid in the same manner as other judgments of the said court."

We come now to what is known as the Bowman act of March 3, 1883, c. 116, entitled " An act to afford assistance and relief to Congress and the Executive Departments in the investigation of claims and demands against the Government." 22 Stat. 485.

By the first section of that act it is provided : " Sec. 1. Whenever a claim or matter is pending before any committee of the Senate or House of Representatives, or before either House of Congress, which involves the investigation and determination of facts, the committee or House may cause the same, with the vouchers, papers, proofs, and documents pertaining thereto, to be transmitted to the Court of Claims of the United States, and the same shall there be proceeded in under such rules as the court may adopt. When the facts shall have been found, the court shall not enter judgment thereon, but shall report the same to the committee or to the House by which the case was transmitted for its consideration."

The second section is in these words : " Sec. 2. When a claim or matter is pending in any of the Executive Departments which may involve controverted questions of fact or law, the head of such Department may transmit the same, with the vouchers, papers, proofs, and documents pertaining thereto, to said court, and the same shall be there proceeded in under such rules as the court may adopt. When the facts and conclusions of law shall have been found, the court shall not enter judgment thereon, but shall report its findings and opinions to the Department by which it was transmitted for its guidance and action."

As the Bowman act contains no words of express repeal, the question arises whether, by necessary implication, its second section superseded section 1063 of the Revised Statutes, in respect of claims transmitted by an Executive Department to the Court of Claims.

The Court of Claims was required by section 1063 of the Revised Statutes to adjudicate any claim, properly transmitted from an Executive Department, by a final judgment, while the Bowman act prohibited any judgment being entered for

or against a claim transmitted under that act; the duty of the court, in cases involving controverted questions of fact or law, transmitted to and heard by it under the Bowman act, being only to report its findings of fact and conclusions of law to the proper Department, for "its guidance and action."

It is, nevertheless, suggested that the Bowman act, although without words of repeal, covers the entire subject of claims involving controverted questions of fact or law that may be transmitted to the Court of Claims from an Executive Department, and, it is argued, that we must apply the rule that a prior statute is to be regarded as repealed or modified where " the last statute is so broad in its terms and so clear and ex-. plicit in its words as to show that it was intended to cover the whole subject, and, therefore, to displace the prior statute." *Frost* v. *Wenie*, 157 U. S. 46, 58.

If that act be held to have displaced the whole of section 1063 of the Revised Statutes (except the clause relating to claims transmitted by the Secretary of the Treasury, upon the certificate of an Auditor or of the Comptroller of the Treasury) the result would be that after its passage the Court of Claims was wholly without jurisdiction to render *judgment* or any claim for money transmitted from an Executive Department, whatever its nature or amount. Such a construction would exclude from judicial cognizance by that court not only claims exceeding $3000 in amount, and specifically designated as claims involving controverted questions of law and fact, but even claims the determination of which would affect a class of cases, or furnish a precedent for the future action of an Executive Department, and claims that involved an authority, right, privilege, or exemption asserted or denied under the Constitution of the United States. Congress, when it passed the Bowman act, must have had in view the provisions of section 1063 of the Revised Statutes under which the Court of Claims had so long exercised jurisdiction of claims for money made against an Executive Department and transmitted to that court for final adjudication. As the Bowman act makes no reference to that section, and contains no words of repeal, we cannot suppose that Congress intended to take from the

Court of Claims jurisdiction to render judgment in cases coming before it under the Revised Statutes. The object of that act is expressed in its title, and was to afford assistance and relief to Congress and the Executive Departments in the *investigation* of claims and demands against the Government. To that end, and in respect of claims and demands involving controverted questions of fact or law and pending in the Executive Departments, authority was given to the heads of such Departments upon their own motion, and whether the claimant desired it or not, to obtain, for their "guidance and action," findings of fact and conclusions of law, without regard to the amount involved. *Billings* v. *United States*, 23 C. Cl. 166, 174. Neither expressly nor by necessary implication did that act take from an Executive Department the right to send to the Court of Claims, for *final adjudication*, any claim made against it that was embraced by section 1063 of the Revised Statutes. So far as the Bowman act related to claims for money pending in an Executive Department, it only authorized the head of the Department to send them to that court for a report of facts and conclusions that would not have the force of a judgment reviewable by this court. In this view, there is no conflict between the Bowman act and the Revised Statutes. As there are no words of repeal in the Bowman act, we have given it such construction as will make it consistent with previous legislation, and thus avoid the abrogation of existing statutes which Congress had not repealed either expressly or by necessary implication. The second section of the Bowman act should be construed as if it were a proviso to section 1063 of the Revised Statutes. Thus construed the later statute is not in conflict with the earlier one.

We turn now to the act of March 3, 1887, c. 359, known as the Tucker act, entitled "An act to provide for the bringing of suits against the Government of the United States." 24 Stat. 505.

The first section of that act gives the Court of Claims original jurisdiction to hear and determine all claims founded upon the Constitution of the United States or any law of Congress,

except for pensions, or upon any regulation of an Executive Department, or upon any contract, expressed or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable : nothing, however, in that section to be construed as giving to any of the courts mentioned in the act jurisdiction to hear and determine claims growing out of the late Civil War, and commonly known as "war claims," nor other claims theretofore rejected, or reported on adversely by any court, Department, or commission authorized to hear and determine the same. Jurisdiction was also given of all set-offs, counterclaims, claims for damages, whether liquidated or unliquidated, or other demands whatsoever on the part of the Government of the United States against any claimant. It also provided that no suit against the Government of the United States should be allowed under that act unless the same was brought within six years after the right accrued for which the claim is made.

Other sections of that act are as follows :

" SEC. 12. That when any claim or matter may be pending in any of the Executive Departments which involves controverted questions of fact or law, the head of such Department, *with the consent of the claimant,* may transmit the same, with the vouchers, papers, proofs, and documents pertaining thereto, to said Court of Claims, and the same shall be there proceeded in under such rules as the court may adopt. When the facts and conclusions of law shall have been found, the court shall report its findings to the Department by which it was transmitted.

" SEC. 13. That in every case which shall come before the Court of Claims, or is now pending therein, under the provisions of an act entitled ' An act to afford assistance and relief to Congress and the Executive Departments in the investigation of claims and demands against the Government,' approved March third, eighteen hundred and eighty-three [the Bowman act], if it shall appear to the satisfaction of the court,

upon the facts established, that it has jurisdiction to render judgment or decree thereon under existing laws or under the provisions of this act, it shall proceed to do so, giving to either party such further opportunity for hearing as in its judgment justice shall require, and report its proceedings therein to either House of Congress or to the Department by which the same was referred to said court." By its sixteenth section all laws and parts of laws inconsistent with that act were repealed.

What is the scope of the twelfth section of the Tucker act? Did that section supersede section 1063 of the Revised Statutes, or section two of the Bowman act?

It is difficult to tell what was intended by the words "with the consent of the claimant," in the twelfth section of the Tucker act. If Congress intended that no claim, large or small in amount, involving controverted questions of fact or law, and pending in an Executive Department, should be transmitted to the Court of Claims, except with the consent of the claimant, that intention would have been expressed in words that could not have been misunderstood; for that court had long exercised jurisdiction in cases of that kind. But, in view of the words used, no such purpose can be imputed to Congress. The Tucker act cannot be held to have taken the place of section two of the Bowman act; for section thirteen of the Tucker act distinctly provides for *judgment in every case* then pending in or which might come before the Court of Claims *under the Bowman act*, of which that court could have taken judicial cognizance if the case had been commenced originally by suit instituted in that court by the claimant. That Congress did not intend to supersede the Bowman act is made still more apparent by the fourteenth section of the Tucker act, declaring "that whenever any bill, except for a pension, shall be pending in either House of Congress providing for the payment of a claim against the United States, legal or equitable, or for a grant, gift, or bounty to any person, the house in which such bill is pending may refer the same to the Court of Claims, who shall proceed with the same *in accordance with the provisions of the act* approved March third, eighteen hundred and eighty-three, entitled ' An

act to afford assistance and relief to Congress and the Executive Departments in the investigation of claims and demands against the Government,' [the Bowman act] and report to such House the facts in the case and the amount, where the same can be liquidated, etc." It thus appears that any bill, except for a pension, in either House of Congress, providing for the payment of a claim against the United States, legal or equitable, or for a grant, gift, or bounty to any person, may be transmitted to the Court of Claims, to be proceeded in, not, let it be observed, under the Tucker act, but under the Bowman act of March 3, 1883, and to report the facts, etc., to such House. It is impossible, therefore, to hold that the Tucker act displaced or repealed the second section of the Bowman act.

In our opinion the twelfth section of the Tucker act should be construed as not referring to claims which an Executive Department, proceeding under section 1063 of the Revised Statutes, seeks to have finally adjudicated by the Court of Claims, nor to claims described in that section, in respect of which the Department, upon its own motion, and whether the claimant consents or not, desires from that court a report under the Bowman act, of facts and law for its guidance and action. It refers only to claims which the head of an Executive Department, with the expressed consent of the claimant, may send to the Court of Claims in order to obtain a report of facts and law which the Department may regard as only advisory. It no doubt often happened that the head of a Department did not desire action by the Court of Claims in relation to a particular claim, but, in order to meet the wishes of the claimant, was willing to have a finding by that court which was not followed by a judgment, nor by any report for the guidance and action of the Department. So that section 1063 of the Revised Statutes, the second section of the Bowman act, and the twelfth section of the Tucker act may be regarded as parts of one general system, covering different states of case, and standing together without conflict in any essential particular.

The claim of New York, being for money and founded on

an act of Congress, was within the general jurisdiction of the Court of Claims. If not barred by limitation it could, in the discretion of the Secretary of the Treasury, have been transmitted or certified to the Court of Claims under the Bowman act after its passage for a finding of facts or law, and that court, when the Tucker act came into operation, could, under its thirteenth section, have rendered a final judgment, sending, however, to the Treasury Department a report of its proceedings. But the Secretary of the Treasury, in the exercise of an authority given him by statute and never withdrawn, chose to certify or transmit this claim to the Court of Claims, under section 1063 of the Revised Statutes, for final adjudication.

Touching the suggestion that the twelfth section of the Tucker act entirely superseded the second section of the Bowman act, it may be further observed that the Tucker act repeals only such previous statutes as were inconsistent with its provisions. There is no inconsistency between the sections just named; one, as we have said, the second section of the Bowman act, relating to claims involving controverted questions of fact or law, which an Executive Department may transmit to the Court of Claims without consulting the wishes of the claimant, in order to obtain a report of facts and law for its guidance and action; the other, the twelfth section of the Tucker act, relating to claims of the same class transmitted to that court with the expressed consent of the claimant in order to obtain a report of facts and law that would be only advisory in its character.

The object of the thirteenth section of the Tucker act is quite apparent. A case transmitted under the Bowman act is, we have seen, one in which the findings of fact and law are made for the guidance and action of the Executive Department from which it came, and, therefore, a rendition of judgment, in such a case, if it be one of which the court could at the outset have taken cognizance at the voluntary suit of the claimant, would be a saving of time for all concerned. If the cases embraced by the twelfth section of the Tucker act were only those provided for by the second section of the

Bowman act, the thirteenth section of the Tucker act, authorizing a final judgment or decree where the claim was one of which the court could originally have taken jurisdiction for purposes of final adjudication, would not have made special reference to cases coming before the Court of Claims under the Bowman act.

Our conclusions, then, as to the several statutes under examination, so far as they relate to claims pending in an Executive Department, are —

First. Any claim made against an Executive Department, " involving disputed facts or controverted questions of law, where the amount in controversy exceeds three thousand dollars, or where the decision will affect a class of cases, or furnish a precedent for the future action of any Executive Department in the adjustment of a class of cases, without regard to the amount involved in the particular case, or where any authority, right, privilege or exemption is claimed or denied under the Constitution of the United States," may be transmitted to the Court of Claims by the head of such department under section 1063 of the Revised Statutes for final adjudication; provided, such claim be not barred by limitation, and be one of which, by reason of its subject-matter and character, that court could take judicial cognizance at the voluntary suit of the claimant.

Second. Any claim embraced by section 1063 of the Revised Statutes, without regard to its amount, and whether the claimant consents or not, may be transmitted under the Bowman act to the Court of Claims by the head of the Executive Department in which it is pending, for a report to such department of facts and conclusions of law for " its guidance and action."

Third. Any claim embraced by that section may, in the discretion of the Executive Department in which it is pending, and with the expressed consent of the plaintiff, be transmitted to the Court of Claims, under the Tucker act, without regard to the amount involved, for a report, merely advisory in its character, of facts or conclusions of law.

Fourth. In every case, involving a claim of **money**, trans-.

mitted by the head of an Executive Department to the Court of Claims under the Bowman act, a final judgment or decree may be rendered when it appears to the satisfaction of the court, upon the facts established, that the case is one of which the court, at the time such claim was filed in the department, could have taken jurisdiction, at the voluntary suit of the claimant, for purposes of final adjudication.

Whether the words "or matter" in the second section of the Bowman act embrace any matters, except those involving the payment of money, and of which the Court of Claims under the statutes regulating its jurisdiction could, at the voluntary suit of the claimant, take cognizance for purposes of final judgment or decree, need not be now considered.

It results that as the claim of New York exceeded three thousand dollars, and was certified under section 1063 of the Revised Statutes as one involving controverted questions of law, the court below had jurisdiction to proceed to a final judgment, unless, as suggested by the Assistant Attorney General, the claim when transmitted to the Court of Claims by the Secretary of the Treasury was barred by limitation.

At the time the claim of New York was filed in the Treasury Department there was no statute of limitations in force expressly applicable to cases in the Court of Claims. But by the act of March 3, 1863, c. 92, § 10, it was provided that (with certain exceptions that have no application to this case) every claim against the United States, cognizable by the Court of Claims, should be barred unless the petition setting forth a statement of it was filed in or transmitted to that court within six years after the claim first accrued; claims that had accrued before the passage of that act not to be barred, if filed or transmitted as above stated, within three years after the passage of the act. 12 Stat. 765, 767. This limitation of six years was preserved in the Revised Statutes and in the Tucker act. Rev. Stat. § 1069; 24 Stat. 505.

Was the claim of New York barred because more than six years passed after it accrued before it was transmitted to the Court of Claims? In *Finn* v. *United States*, 123 U. S. 227, 232,

this court said: "The general rule that limitation does not operate by its own force as a bar, but is a defence, and that the party making such a defence must plead the statute if he wishes the benefit of its provisions, has no application to suits in the Court of Claims against the United States. An individual may waive such a defence, either expressly or by failing to plead the statute; but the Government has not expressly or by implication conferred authority upon any of its officers to waive the limitation imposed by statute upon suits against the United States in the Court of Claims. Since the Government is not liable to be sued, as of right, by any claimant, and since it has assented to a judgment being rendered against it only in certain classes of cases, brought within a prescribed period after the cause of action accrued, a judgment in the Court of Claims for the amount of a claim which the record or evidence shows to be barred by the statute, would be erroneous." To the same effect was *DeArnaud* v. *United States*, 151 U. S. 483, 495.

But, in *United States* v. *Lippitt*, 100 U. S. 663, 668, 669, where the question was whether a claim that accrued in 1864, and which was presented to the War Department in 1865, and in 1878 was transmitted to the Court of Claims as one involving controverted questions of law, the decision whereof would affect a class of cases, the court said: "Limitation is not pleadable in the Court of Claims, against a claim cognizable therein, and which has been referred by the head of an Executive Department for its judicial determination, provided such claim was presented for settlement at the proper department within six years after it first accrued, that is, within six years after suit could be commenced thereon against the Government. Where the claim is of such a character that it may be allowed and settled by an Executive Department, or may, in the discretion of the head of such department, be referred to the Court of Claims for final determination, the filing of the petition should relate back to the date when it was first presented at the department for allowance and settlement. In such cases, the statement of the facts, upon which the claim rests, in the form of a petition, is only another mode of assert-

ing the same demand which had previously and in due time been presented at the proper department for settlement. These views find support in the fact that the act of 1868 describes claims presented at an Executive Department for settlement, and which belong to the classes specified in its seventh section, *as cases* which may be transmitted to the Court of Claims. ' And all the cases mentioned in this section, which shall be transmitted by the head of any Executive De- partment, or upon the certificate of any auditor or comp- troller, shall be *proceeded in* as other cases pending in said court, and shall, in all respects, be subject to the same rules and regulations,' with right of appeal. The cases thus trans- mitted for judicial determination are, in the sense of the act, commenced against the Government when the claim is origi- nally presented at the department for examination and settle- ment. Upon their transfer to the Court of Claims they are to be ' proceeded in as other cases in said court.' "

The same principle was recognized in *Finn* v. *United States*, 123 U. S. 227, 232, in which case the court, referring to the act of 1863, limiting the time for bringing suits in the Court of Claims, also said : " The duty of the court, under such circumstances, whether limitation was pleaded or not, was to dismiss the petition ; for the statute, in our opinion, makes it a condition or qualification of the right to a judgment against the United States that — except where the claimant labors under some of the disabilities specified in the statutes — the claim must be put in suit by the voluntary action of the claimant, or be presented to the proper department for settlement, within six years after suit could be commenced thereon against the Government."

Upon the authority of those cases we adjudge that as the claim of New York was presented to the Treasury Depart- ment before it was barred by limitation, its transmission by the Secretary of the Treasury to the Court of Claims for ad- judication was only a continuation of the original proceeding commenced in that department in 1862. The delay by the de- partment in disposing of the matter before the expiration of six years after the cause of action accrued, could not impair the

rights of the State. Of course, if the claim had not been presented to the Treasury Department before the expiration of that period the Court of Claims could not have entertained jurisdiction of it.

For the reasons we have stated the motion of the United States to dismiss the appeal of the State is denied, and we proceed to the examination of the case upon its merits.

The entire sum for which the State asked judgment was $131,188.02, of which $91,320.84 represented the amount paid as interest on moneys borrowed for the purpose of raising troops for the national defence, and for the repayment of which, with interest at seven per cent, the State executed its short-time bonds. The balance, $39,867.18, represented the amount paid as interest on moneys received by way of loan from the Canal Fund and applied by the State for the same purpose.

On behalf of the Government it is contended that payment by the United States of the above sum of $91,320.84 is prohibited both by the statute, act of March 3, 1863, c. 92, 12 Stat. 765, Rev. Stat. § 1091, providing that interest shall not be allowed on any claim up to the time of the rendition of judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest, and by the general rule based on grounds of public convenience, that interest "is not to be awarded against a sovereign government, unless its consent to pay interest has been manifested by an act of its legislature, or by a lawful contract of its executive officers." *United States* v. *North Carolina,* 136 U. S. 211, 216; *Angarica* v. *Bayard,* 127 U. S. 251, 260.

The allowance of the $91,320.84 would not contravene either the statute or the general rule to which we have adverted. The duty of suppressing armed rebellion having for its object the overthrow of the National Government, was primarily upon that Government and not upon the several States composing the Union. New York came promptly to the assistance of the National Government by enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting troops to be employed in putting down the re-

bellion. Immediately after Fort Sumter was fired upon, its legislature passed an act appropriating $3,000,000, or so much thereof as was necessary, out of any moneys in its treasury not otherwise appropriated, to defray any expenses incurred for arms, supplies, or equipments for such forces as were raised in that State and mustered into the service of the United States. In order to meet the burdens imposed by this appropriation, the real and personal property of the people of New York were subjected to taxation. When New York had succeeded in raising thirty thousand soldiers to be employed in suppressing the rebellion, the United States, well knowing that the national existence was imperilled, and that the earnest coöperation and continued support of the States was required in order to maintain the Union, solemnly declared by the act of 1861, that "the costs, charges, and expenses properly incurred" by any State in raising troops to protect the authority of the nation, would be met by the General Government. And to remove any possible doubt as to what expenditures of a State would be so met, the act of 1862 declared that the act of 1861 should embrace expenses incurred before, as well as after, its approval. It would be a reflection upon the patriotic motives of Congress if we did not place a liberal interpretation upon those acts, and give effect to what, we are not permitted to doubt, was intended by their passage. Before the act of July 27, 1861, was passed the Secretary of State of the United States telegraphed to the governor of New York, acknowledging that that State had then furnished fifty thousand troops for service in the war of the rebellion, and thanking the governor for his efforts in that direction. And on July 25, 1861, Secretary Seward telegraphed : "Buy arms and equipments as fast as you can. We pay all." And on July 27, 1861, that "Treasury notes for part advances will be furnished on your call for them." On August 16, 1861, the Secretary of War telegraphed to the governor of New York: "Adopt such measures as may be necessary to fill up your regiments as rapidly as possible. We need the men. Let me know the best the Empire State can do to aid the country in the present emergency." And on February 11,

1862, he telegraphed : "The Government will refund the State for the advances for troops as speedily as the Treasurer can obtain funds for that purpose." Liberally interpreted, it is clear that the acts of July 27, 1861, and March 8, 1862, created, on the part of the United States, an obligation to indemnify the States for *any* costs, charges, and expenses *properly incurred* for the purposes expressed in the act of 1861, the title of which shows that its object was "to *indemnify* the States for expenses incurred by them in defence of the United States."

So that the only inquiry is whether, within the fair meaning of the latter act, the words "costs, charges, and expenses properly incurred" included interest paid by the State of New York on moneys borrowed for the purpose of raising, subsisting, and supplying troops to be employed in suppressing the rebellion. We have no hesitation in answering this question in the affirmative. If that State was to give effective aid to the General Government in its struggle with the organized forces of rebellion, it could only do so by borrowing money sufficient to meet the emergency; for it had no money in its treasury that had not been specifically appropriated for the expenses of its own government. It could not have borrowed money any more than the General Government could have borrowed money, without stipulating to pay such interest as was customary in the commercial world. Congress did not expect that any State would decline to borrow and await the collection of money raised by taxation before it moved to the support of the nation. It expected that each loyal State would, as did New York, respond at once in furtherance of the avowed purpose of Congress, by whatever force necessary, to maintain the rightful authority and existence of the National Government. We cannot doubt that the interest paid by the State on its bonds, issued to raise money for the purposes expressed by Congress, constituted a part of the costs, charges, and expenses properly incurred by it for those objects. Such interest, when paid, became a principal sum, as between the State and the United States, that is, became a part of the aggregate sum properly paid by the State for the United States. The principal and

interest, so paid, constitutes a debt from the United States to the State. It is as if the United States had itself borrowed the money, through the agency of the State. We therefore hold that the court below did not err in adjudging that the $91,320.84 paid by the State for interest upon its bonds issued in 1861 to defray the expenses to be incurred in raising troops for the national defence was a principal sum which the United States agreed to pay, and not interest within the meaning of the rule prohibiting the allowance of interest accruing upon claims against the United States prior to the rendition of judgment thereon.

The Court of Claims disallowed so much of the State's demand as represented interest paid by it on moneys borrowed from the Canal Fund. The instalment of interest paid into that Fund by the State was $48,187.13. But as the State itself earned interest to the amount of $8319.95 on a part of the money obtained by it from the commissioners of the Canal Fund, it only claimed $39,867.18 on account of interest paid to that Fund.

The Canal Fund was made by the constitution of the State a sinking fund for the ultimate liquidation of what is known as the canal debt of New York. In April and May, 1861, $2,039,663.06 from the taxes of 1860 reached the treasury of the State, and under the constitution and laws of New York that amount should have been invested in securities for the benefit of the Canal Fund, and the interest derived from those securities paid into the Fund. The State was permitted to use a part of the above sum under an agreement by its officers that interest thereon at the rate of five per cent should be paid. It recognized and fulfilled that agreement, and now claims that the interest it so paid to the Canal Fund constituted a charge or expense properly incurred in raising, subsisting, and supplying troops to suppress the rebellion.

We are of opinion that, so far as the question of the liability of the United States is concerned, there is, on principle, no difference between the claim for $91,320.84 and the claim for $39,867.18. We do not stop to inquire whether the ac-

tion of the canal commissioners, in allowing the State to use a part of the moneys collected for the benefit of the Canal Fund, was strictly in accordance with law. Suffice it to say, that the Canal Fund was entitled to any interest earned upon moneys belonging to it, and fidelity to the constitution and laws of New York required the State to recognize that right in the only way it could at the time have been done, namely, by paying the interest that ought to have been realized by the commissioners of the Canal Fund, if they had invested in interest-paying securities the moneys they permitted the State to use for military purposes. If the Canal Fund money, used by the state comptroller to defray the expenses of raising and equipping troops, had been borrowed upon the bonds of the State sold in open market, the interest paid on such bonds would, for the reasons we have stated, be a just charge against the United States on account of expenses properly incurred by the State for the purposes expressed by Congress. And such would have been the result if the moneys of the Canal Fund had been invested by the commissioners directly in bonds of the State, bearing the same rate of interest that was paid to the commissioners of that fund. The substance of the transaction was that the State, for moneys that could not be legally appropriated for the ordinary expenses of its own government, and which the law required to be so invested as to earn interest for the Canal Fund, used those moneys for military purposes, under an agreement by its officers, subsequently ratified by the State, to pay interest thereon. It was, in its essence, a loan to the State by the commissioners of the Canal Fund of money to be repaid with interest. The obligation of the United States to indemnify the State, on account of such payment, is quite as great as it would be if the transaction had occurred between the State and some corporation from which it borrowed the money. It is not the case of the State taking money out of one pocket to supply a deficiency in another over which it had full power; for, although the moneys brought into its treasury by the collection of taxes were under its control, the State was without power to manage and control taxes collected for

the Canal Fund, except as provided in its constitution and laws. It could not legally have become a party to any arrangement or agreement involving the use, without interest, of the moneys of the Canal Fund that had been set apart for the ultimate payment of the canal debt.

We are of opinion that the claim of the State for money paid on account of interest to the commissioners of the Canal Fund, is not one against the United States for interest as such, but is a claim for costs, charges, and expenses properly incurred and paid by the State in aid of the General Government, and is embraced by the act of Congress declaring that the States would be indemnified by the General Government for moneys so expended.

*As the State was entitled to a larger sum than $91,320.84, the judgment is reversed, and the cause is remanded with directions for further proceedings not inconsistent with this opinion.*