# United States Court of Appeals for the Federal Circuit

05-5033

JOHN R. SAND & GRAVEL COMPANY,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Jeffrey K. Haynes, Beier Howlett, P.C., of Bloomfield Hills, Michigan, argued for plaintiff-appellant. With him on the brief was L. Rider Brice, III.

Aaron P. Avila, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Kelly A. Johnson, Acting Assistant Attorney General; and Susan V. Cook, John S. Most, Steven D. Bryant, and Kathryn E. Kovacs, Attorneys.

Steven C. Nadeau, Honigman Miller Schwartz and Cohn LLP, of Detroit, Michigan, for amici curiae Brunswick Corporation, et al. With him on the brief were Robert M. Jackson; and Robert K. Huffman, Miller & Chevalier Chartered, of Washington, DC.

Appealed from: United States Court of Federal Claims

Judge Emily C. Hewitt

# United States Court of Appeals for the Federal Circuit

05-5033

JOHN R. SAND & GRAVEL COMPANY,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  August 9, 2006

_____

Before NEWMAN, LOURIE, and SCHALL, Circuit Judges.

Opinion for the court filed by Circuit Judge SCHALL.  Dissenting opinion filed by Circuit Judge NEWMAN.

SCHALL, Circuit Judge.

John R. Sand and Gravel Company ("JRS&G") appeals the final decision of the United States Court of Federal Claims, following a trial, that the United States was not liable to JRS&G under the Fifth Amendment to the Constitution for the alleged taking of JRS&G's leasehold interest in a 158-acre tract of land in Lapeer County, Michigan. John R. Sand & Gravel Co. v. United States, 62 Fed. Cl. 556 (2004) ("Sand & Gravel III").  Because we conclude that JRS&G did not file its complaint within the six-year limitations period of 28 U.S.C. § 2501, we hold that the Court of Federal Claims lacked

jurisdiction. We therefore vacate the Court of Federal Claims's decision and remand the case to the court with the instruction that it dismiss JRS&G's complaint.

BACKGROUND

I.

The pertinent facts, which are not in dispute, are set forth in John R. Sand & Gravel Co. v. United States, 57 Fed. Cl. 182 (2003) ("Sand & Gravel I"), and Sand & Gravel III, 62 Fed. Cl. 556.

In 1969, JRS&G leased a 158-acre tract of land in Metamora Township, Lapeer County, Michigan, from Russell and Mildred Parrish ("Parrish property") for a term of fifty years. Sand & Gravel III, 62 Fed. Cl. at 558. Pursuant to the lease, JRS&G is entitled to the exclusive use of the property for the purpose of mining sand and gravel. Id. at 564.[1]

The Parrish property consists of a rectangular area. Sand & Gravel I, 57 Fed. Cl. at 183 n.3. JRS&G's operations are principally located in its plant area in the east-central portion of the property. JRS&G's plant area contains several buildings, a supply pond, and customer access roads. Id. JRS&G's main sand and gravel pit ("main pit") is

---

[1]     According to the terms of the lease, JRS&G received "exclusive use" of the property

> for the purpose of stripping the land, taking out and removing therefrom the marketable stone and sand, which is, [or] which may hereafter be found on, in or under said land, together with the right to construct or build, and to make all excavations, pits openings, ditches, roadways and other improvements upon the said premises, which are or may become necessary or suitable for removing sand and stone from the said premises.

Sand & Gravel III, 62 Fed. Cl. at 564.

just southeast of the plant area.  Id.  A landfill is located to the north of JRS&G's plant area.  Id.  The landfill is known as the Metamora Landfill.  The features just described, as well as others, are shown on the map of the Parrish property that is titled "February 1994 Fence Alignment Metamora Landfill Site."  The map is included with this opinion as Appendix A.

The Area of Institutional Controls ("AIC") comprises a 42-acre portion of the property to the north of JRS&G's plant area.  It encompasses the entirety of the landfill and some of the property surrounding the landfill wherein the landfill cap system is located.[2]  Id. at 185.  The northern and eastern boundaries of the AIC run along the Parrish property lines.  To the west, the AIC boundary runs just outside the edge of a gravel road.  To the south, the AIC is located to the north of JRS&G's siltation pond.  The southern border of the AIC then cuts to the south to encompass the Stormwater Retention Pond.

At the time JRS&G signed the lease in 1969, the landfill was already operating on the northern portion of the Parrish property.  Sand & Gravel III, 62 Fed. Cl. at 560.  The Parrishes continued to operate the landfill during the first eleven years of JRS&G's leasehold until it closed in 1980.  Id. at 559-60.  During its years of operation, the landfill illegally accepted solid and liquid industrial waste in 55-gallon drums.  Tens of thousands of such drums are currently buried on the site.  Id. at 570.

---

[2]     The landfill cap system involves a cap of impermeable material over the landfill.  The cap is sloped to cause water to run off into a system of ditches.  The ditches feed into a designated retention area away from the landfill.  Id. at 560.  The retention area is shown on the map at Appendix A under the heading "Storm Water Retention Pond."  The cap system prevents water from percolating through the hazardous waste in the landfill and into the aquifer below, thereby contaminating the groundwater.

In 1984, the landfill was placed on the National Priorities List pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9675 (2000), due to the large number of drums containing hazardous waste that had been buried there. See Sand & Gravel III, 62 Fed. Cl. at 559. Pursuant to CERCLA, the Environmental Protection Agency ("EPA") issued its first Record of Decision ("ROD") in 1986.[3] Sand & Gravel I, 57 Fed. Cl. at 183. In the 1986 ROD, the EPA stated that remedial action for the Metamora Landfill would consist of excavating the buried drums of hazardous waste for incineration off-site. The ROD estimated that the excavation would take six to eight months to complete. Pursuant to the 1986 ROD, the EPA not only excavated drums, but also took soil samples, installed groundwater monitoring wells, and constructed a storage pad[4] east of JRS&G's plant area. Id.

In 1990, the EPA issued a second ROD. Sand & Gravel III, 62 Fed. Cl. at 559. In the 1990 ROD, the EPA stipulated additional remedies selected for the containment of the Metamora Landfill and for treatment of the groundwater at the site. Id. at 559-60. These remedies included installing a landfill cap system to prevent further contamination of aquifers by the wastes dumped in the Metamora Landfill and a fence around the landfill to restrict access to the site. Id. at 560. The 1990 ROD also contemplated the continued incineration of excavated drums off-site under the 1986

---

[3]    A ROD is a public record of an EPA decision that describes actions the EPA intends to take. See 40 C.F.R. 6.105(g) (2006). This includes the actions the EPA intends to take with respect to a site containing hazardous waste.

[4]    The EPA installed the storage pad on the property in 1989 to store the drums excavated on the site. The pad was later abandoned by the EPA. JRS&G does not allege a taking of the storage pad in this appeal. On the map at Appendix A the storage pad is labeled "Asphalt Pad."

ROD. The 1990 ROD did not provide a metes and bounds description of the landfill cap and fence or indicate when construction would begin. Sand & Gravel I, 57 Fed. Cl. 183.

Pursuant to the the 1990 ROD, the EPA erected a chain link fence on JRS&G's leasehold during the winter of 1992-1993. Id. at 184. The fence enclosed approximately 60% of the Parrish property, including the entirety of the present AIC, JRS&G's plant area, and JRS&G's main pit. Id. at 184 & n.5. The fence was six feet tall and anchored by posts set 48 inches into the ground. Concrete secured the terminal, corner, and gate posts. The fence was topped with three strands of barbed wire and accompanied by EPA warning and no trespassing signs.

The fence prevented JRS&G from accessing its operations, prompting protests from the company. Id. Following these protests, the EPA allowed JRS&G to access its plant area and relocated the fence. Id. The record reveals that the relocated fence still encompassed the AIC.

In February of 1994, the EPA constructed a new internal security fence that cut off JRS&G's access to parts of its plant area. Id. at 184. The area that was fenced off as of February of 1994 is designated on the map at Appendix A as February 1994 Fence Alignment. As can be seen, as of February of 1994, fencing encompassed the overwhelming portion of JRS&G's leasehold interest.[5] The internal security fence that concerned JRS&G in 1994 is contained within the larger fenced area and cut through JRS&G's plant area in the east-central portion of the property. This fence was relocated later in 1994 to allow JRS&G access to its plant area under the condition that JRS&G not intrude into the area enclosed by the internal security fence. Id. The internal

---

[5] The map shows that in 1994 the fence constructed in 1992 still encircled the entirety of JRS&G's plant area and its main pit.

security fence was moved again in 1996 and in May of 1998. The AIC remained fenced off each time the internal security fence was moved. However, JRS&G continued to mine sand and gravel in parts of the AIC as late as 1996. Sand & Gravel I, 57 Fed. Cl. at 189.

During the 1990s, JRS&G and the EPA disagreed on numerous issues. Counsel for JRS&G wrote a series of letters from 1992-1994 asserting JRS&G's property rights and entitlement to just compensation. Id. at 184. In addition to the letters, JRS&G repeatedly physically interfered with the EPA's operations.[6] As a result of the disputes between JRS&G and the EPA, on December 18, 1996, the EPA issued an Administrative Order requiring JRS&G to cooperate with the EPA. Id. The Administrative Order defined the metes and bounds of the AIC and forbade JRS&G from mining within the AIC. Id. at 185. The order also forbade JRS&G from further interference with the EPA and threatened a fine of $25,000 per day of noncompliance with the order. Id. Disputes arose regarding JRS&G's compliance with the Administrative Order, and on March 23, 1998, the United States District Court for the Eastern District of Michigan entered an order enjoining JRS&G from further interference with the EPA's remedial efforts. Id. Shortly after the issuance of the district court's order, the fence was realigned. This fence realignment was complete in May of 1998. Id.

---

[6] JRS&G's interference included cutting the locks and entering fenced-off portions of the property, blocking the EPA's access to the site by obstructing the access road either by piling dirt on it or by flooding it through overfilling its siltation pond, and threatening to drive its loaders through the gates in the fence unless it was given access to fenced-off portions of the property.

On May 20, 2002, JRS&G filed suit in the Court of Federal Claims. In its complaint, JRS&G alleged that the EPA's construction of the landfill cap, occupation of the AIC, construction of fences and access roads, and installation of groundwater monitoring wells amounted to a permanent physical taking. Compl. at 4-5, 9-11. JRS&G also alleged that the court orders created an easement appurtenant for access by the EPA and were thus a physical taking by the EPA. Id. at 11-13.

In due course, the government moved for dismissal of the complaint for lack of jurisdiction on the ground that JRS&G's suit was untimely.[7] The government argued that JRS&G's suit was time-barred because it was filed after the running of the six-year limitations period of 28 U.S.C. § 2501. Sand & Gravel I, 57 Fed. Cl. at 186. According to the government, JRS&G's claim accrued in December of 1992, when the government physically occupied the property, installed monitoring wells, and fenced off parts of the Parrish property. Id. On July 27, 2003, the Court of Federal Claims denied the government's motion with respect to most of the Parrish property that was allegedly taken because it concluded that the government had not met its burden of showing that there was no genuine issue of material fact as to whether the government had "clearly and permanently" taken the property in 1992. Id. at 189. The alleged taking in 1992 was not permanent, the court found, because (i) JRS&G was allowed access to the property after protesting the construction of the fence, (ii) it continued to mine sand and gravel on the property, including the AIC, between 1991 and 1996, and (iii) it was

---

[7] The government moved for judgment on the pleadings, or in the in the alternative, summary judgment. Sand & Gravel I, 57 Fed. Cl. at 182-83. The court treated the motion as one for summary judgment because the parties included materials outside the pleadings in their briefing. Id. at 185.

allowed to tour the landfill, which was within the AIC. Id. The court acknowledged that JRS&G had been deprived of the right to exclude others from the Parrish property in 1992. However, it determined that the government presence on the property was not sufficiently permanent and exclusive to comprise a physical taking until at least late 1996, when the Administrative Order was issued. Id. The Court of Federal Claims also rejected the government's argument that because JRS&G knew it had a potential takings claim as early as 1992-1994, the claim had accrued. Id. at 190-93. Instead, the court found that JRS&G did not know or have reason to know of the accrual of its claim under United States v. Dickinson, 331 U.S. 745 (1947), because the situation on the Parrish property did not stabilize until 1996 when the EPA issued the Administrative Order, defining the metes and bounds of the AIC and barring JRS&G from entry. Sand & Gravel I, 57 Fed. Cl. at 192-93. The court declined to pinpoint when the claim accrued, but found that the government had failed to meet its burden on summary judgment of demonstrating that there was no genuine issue of material fact as to whether the claim accrued more than six years prior to May 20, 2002, when JRS&G filed its complaint. Id. at 193. Accordingly, the court denied the government's motion to dismiss with respect to most of the property that allegedly had been taken. Id.

The Court of Federal Claims, however, did grant the government's motion to dismiss insofar as it related to JRS&G's claim with respect to the monitoring wells placed on the property in March of 1989. Id. at 183, 189. Under Hendler v. United States, 952 F.2d 1364, 1376 (Fed. Cir. 1991), the court found that the wells were sufficiently permanent to comprise a physical taking upon their installation. Sand & Gravel I, 57 Fed. Cl. at 189. Because the wells were installed over six years before

JRS&G filed its complaint, the court granted summary judgment based on the statute of limitations with regard to the wells.[8] Id. at 193.

Subsequently, the parties cross-moved for summary judgment on liability. On April 2, 2004, the Court of Federal Claims granted in part the government's motion for summary judgment and denied JRS&G's motion for partial summary judgment. John R. Sand & Gravel v. United States, 60 Fed. Cl. 230 (2004) ("Sand & Gravel II"). The court agreed with the government's contention that background principles of Michigan nuisance and property law limit the scope of compensable property interests in a physical takings case such as JRS&G's. Id. at 239. The court then set forth three steps for determining whether background principles of Michigan nuisance and property law limited the use of JRS&G's leasehold: (i) JRS&G had to demonstrate possession of a property interest; (ii) the government had to identify background principles of Michigan law prohibiting certain uses of the property; and (iii) the government had to connect those background principles to the facts to show that the use of the property intended by JRS&G was barred by applicable Michigan law. Id. at 240. The court found that JRS&G had demonstrated its possession of a property interest and that the government had identified applicable principles of Michigan nuisance and property law. Id. at 242-51. However, the court denied the government's motion for summary judgment without prejudice because it found that the government had not sufficiently demonstrated the existence of each of the alleged nuisances at the site. Id. at 243, 245, 247-51.

---

[8] On appeal, JRS&G has not challenged the Court of Federal Claims's holding that its takings claim for the groundwater monitoring wells is barred by the statute of limitations.

After a bench trial, the Court of Federal Claims issued an opinion on October 29, 2004, finding that the government's actions had not taken JRS&G's property. Sand & Gravel III, 62 Fed. Cl. at 589. The Court of Federal Claims revisited the question of when JRS&G's takings claim accrued. Id. at 562-63. The court found that JRS&G's claim accrued when the government first permanently and exclusively occupied JRS&G's property. Id. at 563. The court determined that this occurred in May of 1998, when the government completed its relocation of the perimeter fence around the AIC. Id. The court found that the claim had not accrued prior to May of 1998 because ongoing access disputes between the government and JRS&G precluded the government from permanently and exclusively occupying the property. Id.

After setting the date of accrual as May of 1998, the Court of Federal Claims addressed the merits of JRS&G's takings claim. The court noted that JRS&G, as the plaintiff, bore the burden of demonstrating a legally-cognizable property interest under the framework set out in Sand & Gravel II. Id. at 562. The court found that JRS&G had not met this burden because JRS&G had taken its lease to the Parrish property subject to the landfill. Id. at 568, 570. The court noted that JRS&G knew about the landfill when it signed the lease and had allowed the landfill to operate despite its right to prohibit the landfill's operations under the terms of the lease. Id. The court charged JRS&G with "knowledge of, acquiescence in, and cooperation with" the Parrishes' landfill operation. Id. at 570. "[F]airness and justice," the court concluded, required JRS&G, as a party participating in the illegal landfill operation, to bear the burden of the cleanup in the form of the EPA's presence on the property. Id. at 572 (quoting

<u>Armstrong v. United States</u>, 364 U.S. 40, 49 (1960)). Therefore, the court denied JRS&G's takings claims on the merits.

The court continued that it was, "in the interest of judicial economy and efficiency" to elucidate a second reason why JRS&G could not recover for a physical taking. <u>Id.</u> The court found that continued mining in the AIC would contravene remediation efforts, pollute groundwater, and risk fires from methane. <u>Id.</u> at 579-88. Under Michigan law, the court found that activities resulting in these risks are prohibited. <u>Id.</u> at 589. Thus, under the framework set forth in <u>Sand & Gravel II</u>, the court found that background principles of Michigan law, including both Michigan's Natural Resources and Environmental Protection Act, Mich. Comp. Laws §§ 324.20101-.20142 (2006), and Michigan general nuisance law, allowed the EPA to enter the property to prevent JRS&G from using the property in a way that would result in these nuisances. <u>Sand & Gravel III</u>, 62 Fed. Cl. at 589.

JRS&G appeals from the decision of the Court of Federal Claims granting judgment in favor of the government. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

I.

On appeal, JRS&G argues that the Court of Federal Claims erred when it found that JRS&G's takings claim failed because JRS&G had taken its lease subject to a pre-existing landfill. JRS&G also argues that the principles of "fairness and justice" relied upon by the Court of Federal Claims in its resolution of this issue apply only in regulatory takings cases—not in physical takings cases like JRS&G's. Likewise,

JRS&G argues that the Court of Federal Claims's alternative rationale was incorrect because background principles of nuisance and property law only limit property interests for the purpose of regulatory takings.

The government responds that the Court of Federal Claims did not err in concluding that JRS&G's takings claim failed because JRS&G took the lease for the Parrish property subject to the landfill. Based on principles of "fairness and justice," the government contends that the court properly found that the cooperation between the Parrishes' landfill operation and JRS&G barred JRS&G from recovering for a taking. With regard to the court's alternative rationale based on nuisance law, the government argues that background principles of nuisance and property law, as articulated in Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1029 (1992), properly apply in physical takings cases. The government urges that the Court of Federal Claims properly applied Michigan's background principles of nuisance and property law and thus correctly found that JRS&G's takings claim was barred under this theory. On appeal, the government does not challenge the decision of the Court of Federal Claims in Sand & Gravel I rejecting its argument that the court lacked jurisdiction because JRS&G's claim was time-barred.

Although the government does not raise a jurisdictional challenge on appeal, an amicus, the Metamora Group, does.[9] The Metamora Group argues that the Court of

---

[9] The Metamora Group consists of twelve corporations that contributed waste to the Metamora Landfill. With one exception, these twelve corporations signed a consent decree with the EPA in 1993 in which they agreed to fund the remediation of the Metamora Landfill. Under the consent degree, the corporations agreed to provide "any compensation that the United States may be required to pay to the property owner."

Federal Claims erred in exercising jurisdiction over JRS&G's claim because the claim was barred by the six-year statute of limitations set forth in 28 U.S.C. § 2501. In order for a takings claim to accrue and therefore begin the running of the statute of limitations, the Metamora Group contends, the government's occupation need not have been exclusive. Instead, the amicus argues that a property owner's right to exclude others is the focus of determining when a takings claim accrues. Thus, the amicus argues that the claim accrued over six years prior to the filing of JRS&G's complaint in 1989, when the EPA constructed the storage pad on the Parrish property and began removing drums. Alternatively, the Metamora Group argues that the claim accrued in 1992, when the government constructed a fence barring others from the site, or in 1994, when the government constructed the internal security fence that interfered with JRS&G's operations. By 1994, the amicus argues, the government had declared itself a co-tenant of the property and thus JRS&G's claim had accrued. The amicus argues that to the extent that JRS&G mined within the AIC in 1996 or entered the area enclosed by the fence, it was without the government's permission and did not alter the date of accrual. The Metamora Group contends that by 1994 the government's construction of fences was sufficiently permanent in nature to cause a physical takings claim to accrue. Finally, the Metamora Group states that the court erred in relying on <u>Dickinson v. United</u>

---

(Cont'd. . . . )
      The Metamora Group filed a motion to intervene on October 24, 2003, which was denied by the Court of Federal Claims. <u>John R. Sand & Gravel Co. v. United States</u>, 59 Fed. Cl. 645 (2004). We affirmed the denial "without prejudice to the application of the Metamora Group to participate as <u>amicus curiae</u> in any appeal to this court of the decision on the merits." <u>John R. Sand & Gravel v. United States</u>, 143 Fed. Appx. 317, 319 (Fed. Cir. July 22, 2005). Accordingly, the Metamora Group has filed an amicus brief urging us to find that JRS&G's claim is barred by the statute of limitations. Alternatively, the Metamora Group argues that the decision of the Court of Federal Claims should be affirmed on the merits.

States in its ruling in Sand & Gravel I that JRS&G's claim did not stabilize until within six years of the filing of JRS&G's complaint because Dickinson is only applicable in cases where slow natural processes, such as flooding, are involved.

JRS&G responds in its reply brief that its takings claim accrued when the government realigned the fence encompassing the AIC in May of 1998. JRS&G contends that the Court of Federal Claims properly found that the fences constructed in 1992-1993 and 1994 did not permanently interfere with JRS&G's leasehold and that therefore no takings claim accrued at those times. JRS&G argues that the March 1998 district court order granted the government the undisputed authority to control JRS&G's leasehold property for the first time. Prior to this time, JRS&G asserts, the government's actions were unauthorized and therefore no takings claim accrued. JRS&G attacks the amicus's argument that the 1992-1993 and 1994 fences were sufficiently permanent to form the basis for a takings claim by noting that these fences were removed and therefore cannot form the basis for a permanent takings claim. At oral argument, counsel for the government agreed with JRS&G that its takings claim accrued in May of 1998 and that therefore the statute of limitations, 28 U.S.C. § 2501, did not bar JRS&G's claim.

For the reasons set forth below, we agree with the amicus that JRS&G's suit in the Court of Federal Claims was time-barred and that, therefore, the court lacked jurisdiction. Accordingly, we vacate the court's decision and remand the case to the court with the instruction that it dismiss JRS&G's complaint.

II.

A.

As an appellate court, we must be satisfied that the court whose opinion is the subject of our review properly exercised jurisdiction, regardless of whether the parties challenge the lower court's jurisdiction. Mitchell v. Maurer, 293 U.S. 237, 244 (1934) ("An appellate federal court must satisfy itself not only of its own jurisdiction, but also of that of the lower courts in a cause under review."); Consolidation Coal Co. v. United States, 351 F.3d 1374, 1378 (Fed. Cir. 2003) ("[U]nder federal rules any court at any stage in the proceedings may address jurisdictional issues. Thus, even if the issue is not properly raised, this court sua sponte may consider all bases for the trial court's jurisdiction."). We review the Court of Federal Claims findings of fact for clear error and its legal rulings without deference. Banks v. United States, 314 F.3d 1304, 1307 (Fed. Cir. 2003). Accordingly, we review the trial court's findings of fact relating to jurisdictional issues for clear error. Id. at 1308 (stating that the Court of Federal Claims's "jurisdictional findings of fact are reviewed for clear error"). In this case, the pertinent jurisdictional facts are not in dispute. The Court of Federal Claims's jurisdiction is a question of law which we review de novo. Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000) ("A determination of the Court of Federal Claims' jurisdiction presents a question of law that we review de novo.").

The Tucker Act, 28 U.S.C. § 1491(a)(1), provides the Court of Federal Claims with jurisdiction over takings claims brought against the United States. Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004). Pursuant to 28 U.S.C. § 2501, claims brought in the Court of Federal Claims under the Tucker Act are "barred unless the

petition thereon is filed within six years after such claim first accrues." The six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims. Martinez v. United States, 333 F.3d 1295, 1316 (Fed. Cir. 2003) (en banc) ("It is well established that statutes of limitations for causes of action against the United States, being conditions of the waiver of sovereign immunity, are jurisdictional in nature."); Frazer v. United States, 288 F.3d 1347, 1351 (Fed. Cir. 2002) ("Section 2501 constitutes a jurisdictional limit on the authority of the Court of Federal Claims."); Caguas Cent. Fed. Sav. Bank v. United States, 215 F.3d 1304, 1310 (Fed. Cir. 2000) ("In the Court of Federal Claims, the statute of limitations is jurisdictional, because filing within the six-year period was a condition of the waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491(a)(1)."); Seldovia Native Ass'n v. United States, 144 F.3d 769, 774 (Fed. Cir. 1998); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988). Due to the jurisdictional nature of section 2501 it may not be waived. Hopland Band of Pomo Indians, 855 F.2d at 1577 ("[S]ince the 6-year limitations period of section 2501, serves as a jurisdictional limitation rather than simply as an affirmative defense, such statutes of limitations have been held as not capable of waiver or subject to an estoppel, whether pled or not.") (internal quotation marks omitted).

The dissenting opinion cites several recent Supreme Court decisions in support of the proposition that the statute of limitations set forth at section 2501 is not jurisdictional, including Day v. McDonough, 126 S. Ct. 1675 (2006); Arbaugh v. Y&H Corp., 126 S. Ct. 1235 (2006), Eberhart v. United States, 126 S. Ct. 403 (2005) (per curiam), Scarborough v. Principi, 541 U.S. 401 (2004), and Kontrick v. Ryan, 540 U.S.

443 (2004). None of the foregoing decisions address section 2501. Day, 126 S. Ct. at 1681 (holding that that the one-year statute of limitations for filing a habeas petition under the Antiterrorism and Effective Death Penalty Act of 1996 is not jurisdictional); Arbaugh, 126 S. Ct. at 1245 (addressing whether the numerosity requirement of 42 U.S.C. § 2000e(b) is jurisdictional); Eberhart, 126 S. Ct. at 405 (finding that the seven-day time limit for filing a motion for a new trial under Federal Rules of Criminal Procedure 33(b)(2) and 45(b)(2) is not jurisdictional); Scarborough, 541 U.S. at 414 (finding that the thirty-day time limit for filing a claim for fees under 28 U.S.C. § 2412(d)(1)(B) is not jurisdictional); Kontrick, 540 U.S. at 456 (holding that a time limit for filing a complaint as a creditor in bankruptcy proceedings is not jurisdictional). Instead, the statutes at issue involved minor procedural requirements and time limits that the Court characterized as non-jurisdictional "claim-processing rules." E.g., Kontrick, 540 U.S. at 456. Day is the only case involving a statute of limitations. However, that case did not involve a suit against the United States for money damages. In contrast to a non-jurisdictional claim-processing rule or the statute of limitations in Day, section 2501 sets forth a condition that must be met for a waiver of sovereign immunity in a suit for money damages against the United States.

We have continued to hold that section 2501 creates a jurisdictional prerequisite even after the Supreme Court decided Kontrick and its progeny. See, e.g., MacLean v. United States, __ F.3d __, No. 05-5149, 2006 WL 1897047, at *3 (Fed. Cir. July 12, 2006) ("In the Court of Federal Claims, the statute of limitations 'is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed.'" (quoting Hopland, 855

F.2d at 1576-77)); Goodrich v. United States, 434 F.3d 1329, 1331, 1336 (Fed. Cir. 2006) (affirming the Court of Federal Claims's decision dismissing Goodrich's takings claim for lack of jurisdiction under section 2501 (citing Goodrich v. United States, 63 Fed. Cl. 477, 481 (2005))); Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1378 (Fed. Cir. 2005) ("The statute of limitations is jurisdictional in nature and, as an express limitation on the waiver of sovereign immunity, may not be waived.") (citation omitted).

Further, the six-year statute of limitations of section 2501 enjoys a longstanding pedigree as a jurisdictional requirement. Since 1883 when the Court first held that the statute of limitations was jurisdictional in Kendall v. United States, 107 U.S. 123, 125 (1883), the Court has consistently maintained that the time limit is jurisdictional and therefore cannot be waived. United States v. Wardwell, 172 U.S. 48, 52 (1898) ("[Section 2501's predecessor] is not merely a statute of limitations but also jurisdictional in its nature, and limiting the cases of which the Court of Claims can take cognizance."); see also United States v. New York, 160 U.S. 598, 619 (1896); Austin v. United States, 155 U.S. 417, 427 (1894); De Arnaud v. United States, 151 U.S. 483, 495-96 (1894); Finn v. United States, 123 U.S. 227, 232, 233 (1894); Rice v. United States, 122 U.S. 611, 618-19 (1887). We recognize the Supreme Court's recent jurisprudence concerning claim-processing rules, but do not think that section 2501 falls in that category. Therefore, we are unwilling to disturb the well-settled law that section 2501 creates a jurisdictional condition precedent for suit in the Court of Federal Claims, which may not be waived by the parties. See, e.g., De Arnaud, 151 U.S. at 495-96 ("'The general rule that limitation does not operate by its own force as a bar, but is a defen[s]e, and that the party making such a defen[s]e must plead the statute if he

wishes the benefit of its provisions, has no application to suits in the Court of Claims against the United States. An individual may waive such a defen[s]e, either expressly or by failing to plead the statute, but the government has not expressly or by implication conferred authority upon any of its officers to waive the limitation imposed by the statute upon suits against the United States in the Court of Claims.'" (quoting Finn, 123 U.S. at 232, 233)).

A takings claim accrues "'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'" Goodrich, 434 F.3d at 1333 (quoting Hopland, 855 F.2d at 1577); see also Bowen v. United States, 292 F.3d 1383, 1385 (Fed. Cir. 2002). In addition, the claim only accrues if the plaintiff knew or should have known of the existence of the events fixing the government's liability. Goodrich, 434 F.3d at 1333; Hopland, 855 F.2d at 1577; Kinsey v. United States, 852 F.2d 556, 557 n.* (Fed. Cir. 1988).

B.

The question we must decide then is when JRS&G's takings claim accrued. The Court of Federal Claims held that the claim accrued in May of 1998 when the government relocated the fence around the AIC. We conclude, however, that the claim accrued not later than February of 1994 when the government constructed the fence that cut off JRS&G's access to its plant area. That date was more than six years before JRS&G filed its complaint on May 20, 2002.

The Fifth Amendment provides, "[N]or shall private property be taken for public use without just compensation." U.S. Const. amend. V. Property rights in a physical thing consist of a bundle of rights, including the rights to possess, to use, and to dispose

of the physical thing. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982); United States v. Gen. Motors Corp., 323 U.S. 373, 377-78 (1945) (finding that property rights "denote the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it").

The right to exclude others is "one of the most treasured strands in an owner's bundle of property rights." Loretto, 458 U.S. at 435; see also Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 831 (1987) (noting that the right to exclude others is one of the most essential sticks in the bundle of property rights); Kaiser Aetna v. United States, 444 U.S. 164, 176 (1979) (characterizing the right to exclude as "one of the most essential sticks in the bundle of rights that are commonly characterized as property"); Hendler, 952 F.2d at 1374 (stating that "[i]n the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession—the right to exclude strangers, or for that matter friends, but especially the Government"). When the government permanently and physically occupies property, it effectively destroys the owner's right to exclude, as well as the owner's right to make non-possessory use of the property. Loretto, 458 U.S. at 435-36. Due to the importance of a property owner's right to exclude, we have held that "[t]he Government does not have the right to declare itself a co-tenant-in-possession with a property owner." Hendler, 952 F.2d at 1374; see also Kaiser Aetna, 444 U.S. at 179-80 (holding that "the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation"). Thus, a permanent physical occupation by the government is a per se physical taking requiring compensation under the Fifth Amendment because it destroys, among other rights, a

property owner's right to exclude. Loretto, 458 U.S. at 441; Boise Cascade Corp. v. United States, 296 F.3d 1339, 1353 (Fed. Cir. 2002) ("[A] permanent physical occupation of property, no matter how slight, is a per se taking."); Hendler, 952 F.2d at 1375 ("A physical occupation of private property by the government which is adjudged to be of a permanent nature is a taking, and that is true without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner.").

"A physical occupation . . . is a permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of . . . property." Boise Cascade Corp., 296 F.3d at 1353. Thus, physical occupation by the government only comprises a taking when that occupation is "permanent." Id.; Boling v. United States, 220 F.3d 1365, 1370 (Fed. Cir. 2000); Hendler, 952 F.2d at 1375. "Permanent" has a special meaning in the determination of whether a physical occupation has occurred. See Hendler, 952 F.2d at 1376. In the context of physical takings "'permanent' does not mean forever, or anything like it." Id. A government occupation is "permanent" when the government's "intrusion is a substantial physical occupancy of private property." Id. at 1377. The government's occupation may be permanent even if it is not "exclusive, or continuous and uninterrupted." Id.; see also Skip Kirchdorfer, Inc. v. United States, 6 F.3d 1573, 1582 (Fed. Cir. 1993) ("[A] permanent physical occupation need not be continuous and uninterrupted. An intermittent intrusion still causes a taking.") (citations omitted). The Supreme Court held in Loretto that the placement of cable and connection boxes on the plaintiff's property was a physical taking. 458 U.S. at 441. In Hendler, we held that the placement of

groundwater monitoring wells on the plaintiff's property and the government's periodic presence for installing and servicing the wells was "permanent" and therefore a physical taking. 952 F.2d at 1377. In contrast, we noted that a transient and relatively inconsequential incursion by the government, such as a truckdriver parking on a vacant lot to eat lunch, is not sufficiently permanent to comprise a taking. Id. at 1376-77. Similarly, in Boise Cascade, we determined that government surveyors who briefly entered the plaintiff's land over a period of five months to perform owl surveys did not "permanently" occupy the plaintiff's property. 296 F.3d at 1356. Thus, the determination of whether government occupancy is "permanent" is highly fact-specific. In any event, the installation of fixed physical structures, such as the cable and cable connections in Loretto or the groundwater monitoring wells in Hendler is typical of a "permanent" occupation, while the transient entry of persons via government authority on a plaintiff's property is generally not "permanent."

## C.

We hold that JRS&G's takings claim accrued not later than February of 1994 upon the completion of the 1994 fence. The 1994 security fence ran across JRS&G's plant area, cutting off JRS&G's access to its pond and stockpile areas. Sand & Gravel I, 57 Fed. Cl. at 184. The six-foot fences, with posts that were anchored by concrete in some instances, comprised just the sort of permanent structure have been found to form the basis for a physical takings claim. See Loretto, 458 U.S. at 422 (finding cables attached by screws and nails and a box attached by bolts to be sufficiently permanent to comprise a physical taking); see also Hendler, 952 F.2d at 1376 (finding that groundwater monitoring wells were permanent in nature given their structure). Thus,

the EPA took possession of the property at least as of 1994 when it erected permanent structures to bar JRS&G from portions of the Parrish property.[10]

The EPA's presence destroyed JRS&G's right to exclude others from its leasehold, one of the most treasured rights of property owners. See Kaiser Aetna, 444 U.S. at 176. Further, the EPA's 1994 fence also inhibited JRS&G's right to use its property free of interference. In fact, the firm conducting the remediation efforts stated that the removal of the offending portions of the 1994 fence "will be contingent upon John R's agreement to stay out of the new security area." Pl.'s Mem. In Opp'n to Def.'s Mot. for J. on the Pleadings, Exh. 10 (Jan. 23, 2003). Thus, the EPA and its agents placed conditions on the use of JRS&G's property in exchange for relocating the fence—destroying the use strand in JRS&G's bundle of property rights in addition to JRS&G's right to exclude. Based on the foregoing, we find that, not later than 1994, the

---

[10] We express no opinion as to whether the construction of the 1992-1993 fence around the entirety of JRS&G's operations was sufficiently permanent for a takings claim to accrue.

Although not argued by the amicus, we note that the EPA's issuance of RODs in 1986 and 1990 was not sufficient for a physical takings claim to accrue in this case. In Goodrich v. United States, 434 F.3d 1329 (Fed. Cir. 2006), we found that a takings claim accrued upon the issuance of an ROD ordering that Goodrich allow another rancher's animals to drink on his allotment of federal land. Id. at 1332. The agency specified both the number of animals and the rancher to whom they belonged. Id. We affirmed the Court of Federal Claims's characterization of the taking as regulatory rather than physical and its finding that the regulatory takings claim accrued upon the issuance of the ROD. Id. at 1333-35. We find that the date of issuance of the 1986 and 1990 RODs did not mark the accrual of JRS&G's takings claim for two reasons. First, unlike Goodrich, JRS&G's claim is for a physical taking, rather than a regulatory taking. Second, the two RODs issued with regard to the Metamora Landfill did not contain the level of detail about the government's actions necessary for a claim to accrue. The 1986 ROD set forth remedies for removal of drums of waste, which the EPA predicted would take six to eight months. The 1986 ROD did not set forth the long-term plan for site remediation challenged by JRS&G. The 1990 ROD did propose a long-term remediation plan involving a landfill cap system. However, the ROD did not set forth the metes and bounds of the landfill cap or a specific timeframe for its completion. Sand & Gravel I, 57 Fed. Cl. at 184.

EPA had effectively declared itself a co-tenant in possession of a portion of the property and that accordingly, JRS&G's takings claim accrued at that time.

Although we acknowledge that the EPA relocated portions of the fence in 1994 to accommodate JRS&G's need for access to its plant area, we note that the fence remained on the property and that the EPA continued to carry on its remediation activities on the leasehold. The net effect of the restructuring of the fence in 1994 was to reduce the area around the landfill enclosed by fencing—the government did not remove the fence entirely. The EPA's willingness to alter the parameters of the fence does not change the fact that the fence itself was permanent in nature. The fact that JRS&G interfered with the EPA's efforts and ignored the fence until ordered in 1998 by the United States District Court for the Eastern District of Michigan to cooperate with the EPA, does not alter our conclusion. Likewise, we find that a physical occupation of the fenced area occurred despite JRS&G's continued and permitted use of the area not enclosed by the 1994 fence. See Loretto, 458 U.S. at 430 (finding that a permanent physical occupation is a taking even if the government "occup[ies] only relatively insubstantial amounts of space and do[es] not seriously interfere with the landowners use of the rest of his land").

We find unpersuasive the Court of Federal Claims's reliance in Sand & Gravel I on 767 Third Avenue Associates v. United States, 48 F.3d 1575 (Fed. Cir. 1995). In 767 Third Avenue Associates, the plaintiff was a landlord who leased three properties to offices of the Socialist Federal Republic of Yugoslavia. Id. at 1576. In response to political unrest in Yugoslavia, the United States government ordered closure of the operations of the three tenants. Id. at 1577. After the three tenants left, agents of the

Department of the Treasury inspected the plaintiff's premises and posted a notice on the door of each office stating that it was "CLOSED BY ORDER OF THE UNITED STATES DEPARTMENT OF THE TREASURY" and that "NO ACCESS TO THESE PREMISES IS PERMITTED." We held that there was no per se physical taking because "the government did not physically occupy the premises at 767 Third Avenue." Id. at 1583. We noted that the notices were up for less than three months, that the locks were not changed, that nothing physical was attached to the premises except for the notices, and that no guards were placed at the door. Id. Further, the landlord was allowed access on request. Id. The Court of Federal Claims drew a comparison between 767 Third Avenue Associates's facts and those relating to the 1992 and 1994 fences by noting that JRS&G was allowed access to its plant area shortly after it protested the fences. Id. However, unlike 767 Third Avenue Associates, the government physically entered JRS&G's property for a prolonged period. Further, remediation equipment was stored on the property for extended periods, and permanent physical structures, fences, were erected. The mere fact that JRS&G was allowed access to portions of the property on request does not alter the fact that the government had a presence of a "permanent nature" on JRS&G's leasehold not later than 1994. See Skip Kirchdorfer, Inc., 6 F.3d at 1583 (holding that "retention of some access rights . . . does not preclude a per se taking").

In addition to concluding that all the events fixing the government's liability occurred not later than 1994, we think that the Court of Federal Claims erred in concluding that JRS&G neither knew nor should have known of those events as of 1994. See Sand & Gravel I, 57 Fed. Cl. at 192-93. The Court of Federal Claims found

that JRS&G's claims did not stabilize under <u>Dickinson</u>, 331 U.S. 745, until at least 1996 due to the changing boundaries of the fences and JRS&G's ability to mine within the AIC during the 1992-1996 period.[11]   <u>See</u> <u>Sand & Gravel I</u>, 57 Fed. Cl. at 192.   In <u>Dickinson</u>, property owners experienced intermittent flooding and could not determine at the outset the frequency or permanency of the flooding.  Thus, only when the situation "stabilized" did a takings claim accrue.  331 U.S. at 749.  In <u>Northwest Louisiana Fish & Game Preserve Commission v. United States</u>, 446 F.3d 1285, 1290-91 (Fed. Cir. 2006), we recently applied <u>Dickinson</u> to the overgrowth of aquatic weeds in a lake controlled by the United States Corps of Engineers.  In contrast, the present case does not involve the type of gradual physical process that was involved in <u>Dickinson</u> or <u>Northwest Louisiana Fish</u>, but rather the entry of the EPA onto the plaintiff's leasehold.  Both the Supreme Court and our court have acknowledged that the <u>Dickinson</u> stabilization doctrine is only applicable in cases involving gradual physical processes.  <u>See, e.g.</u>, <u>United States v. Dow</u>, 357 U.S. 17, 27 (1958) ("The expressly limited holding in <u>Dickinson</u> was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated to public use."); <u>Ariadne Fin. Servs. Pty. Ltd. v. United States</u>, 133 F.3d 874, 879 (Fed. Cir. 1998) ("The <u>Dickinson</u> stabilization principle, however, does not apply outside its context.  Later cases have essentially confined the stabilization doctrine to the class of flooding cases from which it originated.").  We conclude that the Court of Federal Claims erred by extending the <u>Dickinson</u> stabilization

---

[11]   On appeal, JRS&G states that it mined within the AIC as late as 1997. For purposes of our decision, whether JRS&G last mined within the AIC in 1996 or 1997 does not matter.

doctrine outside the realm of gradual physical processes caused by government action, such as flooding or plant overgrowth, into the area of direct government entry onto property. Therefore, JRS&G's takings claim accrued no later than February of 1994. That JRS&G knew or should have known that its claim had accrued at that time is evidenced by the letters written by JRS&G between 1992 and 1994 threatening suit against the EPA. See Sand & Gravel I, 57 Fed. Cl. at 184.

Finally, we reject JRS&G's argument that its claim did not accrue until 1998 because the EPA's actions were not authorized until the United States District Court for the Eastern District of Michigan issued its March 1998 order. This argument lacks merit because, when the EPA and its agents entered JRS&G's leasehold, the government was acting in accordance with the authority granted to the EPA by Congress in CERCLA.[12] See Armijo v. United States, 229 Ct. Cl. 34, 41 (1981) (finding a Tucker Act claim viable when Congress authorizes the government to take property).

Because we decide the case on jurisdictional grounds, it is unnecessary to address whether background principles of nuisance and property law, as articulated in Lucas, apply in physical takings, or whether JRS&G took the lease subject to the landfill.

CONCLUSION

In sum, we hold that JRS&G's takings claim accrued not later than February of 1994, when the security fence was complete. JRS&G did not file its complaint until over six years later on May 20, 2002. Therefore, the claim is barred by the statute of

---

[12] Pursuant to CERCLA, the EPA is "authorized to enter at reasonable times any . . . facility, establishment, or other place or property where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed of, or transported from." 42 U.S.C. § 9604(e)(1), (e)(3)(A).

limitations and the Court of Federal Claims lacks jurisdiction to consider it.  Accordingly,

we vacate the Court of Federal Claims's decision and remand the case to the court with

the instruction that it dismiss JRS&G's complaint.

COSTS

Each party shall bear its own costs.

VACATED and REMANDED

**Appendix A**



FEBRUARY 1994 FENCE ALIGNMENT
METAMORA LANDFILL SITE
Lapeer County, Michigan

LEGEND

| | |
|---|---|
| —×—×—×— | FEBRUARY 1994 FENCE ALIGNMENT |
| — — — | PROPERTY BOUNDARIES |
| ════════ | GRAVEL ROAD |
| — — — — | LIMIT OF LANDFILL CAP |
| ——————— | CURRENT AREA OF INSTITUTIONAL CONTROL (AIC) |
| — — — | APPROXIMATE WIEGAND MINING INTEREST (BY MARCH 2000 CONSENT JUDGEMENT) |

NOTE: ALL SITE FEATURES EXCEPT FENCE ARE FROM 2000 BASE MAP OUTSIDE AIC AND 2001 BASE MAP INSIDE AIC)

003)GN-DE005 MAY 06/2004

05-5033                                    29

# United States Court of Appeals for the Federal Circuit

05-5033

JOHN R. SAND & GRAVEL COMPANY,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

NEWMAN, Circuit Judge, dissenting.

The threshold question is whether, more than six years before this suit was filed, all of the events occurred whereby government action can be held to have permanently deprived JRS&G of its property rights. This is a question of fact, and its answer determines whether this lawsuit was timely brought. However, it is not a question of "jurisdiction," for the Court of Federal Claims, without dispute, had jurisdiction of the parties and the subject matter. See United States v. Causby, 328 U.S. 256, 267 (1946) ("If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine"). The text of the statute confirms that the limitations period is applied to claims of which the Court of Federal Claims already "has jurisdiction":

> 28 U.S.C. §2501. Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

Contrary to the position of the panel majority, the limitations period is not itself a matter of jurisdiction. See Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998) (the "statutory language confirms that the question of a time bar on [plaintiff's] claim does not affect the subject matter jurisdiction of the Court of Federal Claims"); Grass Valley Terrace v. United States, 69 Fed. Cl. 341, 347 (2005) ("This plain English interpretation of the statute is supported by the Federal Circuit cases that have *closely examined* this issue") (emphasis in original). My colleagues read the phrase "has jurisdiction" out of the statute and thereby violate the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001). Their interpretation is also inconsistent with the trial court's own rules, which state that the "statute of limitations" is an "affirmative defense." Rule of the Court of Federal Claims 8(c).

The panel majority reasons that §2501 is "jurisdictional" because it is a "condition that must be met for a waiver of sovereign immunity in a suit for money damages against the United States." Maj. op. at 17. That is incorrect. Section 2501 is an unexceptional statute of limitations that is interpreted like any other statute of limitations. See Irwin v. Department of Veterans Affairs, 498 U.S. 89, 94 (1990) (statutes of limitations on suits against the government should be treated "in the same way" as statutes of limitations in private suits); Franconia Associates v. United States, 536 U.S. 129, 145 (1986) ("limitations principles should generally apply to the Government in the same way that they apply to private parties"). In Franconia Associates the Court rejected the government's attempt to ascribe a "special" interpretation to §2501 on a theory of sovereign immunity:

> We do not agree that § 2501 creates a special accrual rule for suits against the United States. Contrary to the Government's contention, the text of § 2501 is unexceptional: A number of contemporaneous state statutes of limitations applicable to suits between private parties also tie the commencement of the limitations period to the date a claim "first accrues." . . . In line with our recognition that limitations principles should generally apply to the Government "in the same way that" they apply to private parties, we reject the Government's proposed construction of § 2501. That position, we conclude, presents an "unduly restrictive" reading of the congressional waiver of sovereign immunity, rather than "a realistic assessment of legislative intent."

536 U.S. at 145 (internal citations omitted).  My colleagues make the same mistake; they fail to see §2501 for what it is: an "unexceptional" statute of limitations that is interpreted like any other.  Instead, they impose an "unduly restrictive" interpretation on §2501, transforming it into a "jurisdictional" statute, contrary to the statutory text, and contrary to precedent.

The panel majority relies on Supreme Court cases interpreting a superceded statute, and Federal Circuit panel decisions applying overruled precedent.  For example, Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988) relies on Soriano v. United States, 352 U.S. 270, 276 (1957), which interprets §2501 as a jurisdictional bar not subject to tolling.  The Court in Irwin overruled Soriano, and clarified that limitations principles apply to the government "in the same way" as they are applied to private parties, e.g., they may be tolled or waived in appropriate circumstances.  Irwin, 498 U.S. at 94-96.  My colleagues cite Goodrich v. United States, 434 F.3d 1329, 1336 (Fed. Cir. 2006), and Caguas Cent. Fed. Savings Bank v. United States, 215 F.3d 1304, 1310 (Fed. Cir. 2000), which rely solely on Hopland.  They also cite Frazer v. United States, 288 F.3d 1347, 1351 (Fed. Cir. 2002), which cites Caguas, and Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1378 (Fed. Cir. 2005), which cites Hart v. United States, 910

05-5033                                                            3

F.2d 815, 818-19 (Fed. Cir. 1990), a case also citing Hopland. None of these cases grounded on Hopland accounts for the Court's recent jurisprudence, under which it is clear that it is incorrect to accord unique status to §2501 and hold that it is a limit on "jurisdiction." My colleagues also cite Martinez v. United States, 333 F.3d 1295 (Fed. Cir. 2003) (*en banc*), which left the matter unresolved.

In contrast, other panel decisions have correctly interpreted §2501 as a statute of limitations, not a jurisdictional limit on the Court of Federal Claims. See Venture Coal Sales Co. v. United States, 370 F.3d 1102, 1105 n.2 (Fed. Cir. 2004) ("The most precise ground for the trial court's decision here therefore would seem to be that Venture Coal failed to make its claim within the required limitations period -- that is not a question of subject matter jurisdiction of the" Court of Federal Claims); Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998) ("the question of a time bar on [plaintiff's] claim does not affect the subject matter jurisdiction of the Court of Federal Claims"); Henke v. United States, 60 F.3d 795, 798 n.3 (Fed. Cir. 1995) ("The raising of the statutory bar to a remedy does not, as such, deprive the court of jurisdiction to hear the cause in the first instance. Indeed, the court could not adjudicate the question of the proper application of the statute if it did not have subject matter jurisdiction over the claim"); Borough of Alpine v. United States, 923 F.2d 170, 171 n.1 (Fed. Cir. 1991) (despite an untimely filing the "Claims Court has and will continue to have jurisdiction over the subject matter of Contract Disputes Act cases").

The Supreme Court has, in several recent statements, emphasized that statutes of limitations and time prescriptions are not "jurisdictional." See Arbaugh v. Y & H Corp., 126 S. Ct. 1235, 1242 (2006) (stating that the Court has established that time prescriptions are

not jurisdictional); <u>Day v. McDonough</u>, 126 S. Ct. 1675, 1681 (2006) ("A statute of limitations defense, the State acknowledges, is not 'jurisdictional,' hence courts are under no *obligation* to raise the time bar *sua sponte*") (emphasis in original); <u>Eberhart v. United States</u>, 126 S. Ct. 403, 405 (2005) ("They are not 'jurisdiction[al],' but are instead 'claim-processing rules,' that may be 'unalterable on a party's application' but 'can nonetheless be forfeited if the party asserting the rule waits too long to raise the point'"); <u>Scarborough v. Principi</u>, 541 U.S. 401, 414 (2004) (time prescriptions are "not properly typed 'jurisdictional'"); <u>Kontrick v. Ryan</u>, 540 U.S. 443, 456 (2004) ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority").

Thus, the question is whether the statute that sets a six-year limit on claims against the United States has been met on the facts affecting JRS&G. Both the government and JRS&G agree that the statute of limitations has not run. Since it is not "jurisdictional," it need not be considered *sua sponte* by this court.

Despite this clear waiver and concession by the government, my colleagues overrule the Court of Federal Claims, reject the position of the government, and hold that the six-year limitations period started to accrue by February 1994 when the EPA erected its first transient security fence. The Court of Federal Claims found that JRS&G had access to and mining use of much of that property until at least the December 1996 Administrative Order, for the EPA soon moved the fence to enclose a smaller area, and also permitted access by JRS&G to mine sand and gravel in parts of the smaller area. The government recognized and testified that JRS&G was not permanently excluded from the property until May 1998.

See Defendant's Response to the Court's Order of July 7, 2004 ("it appears that it was not until May 1998 . . . that plaintiff was clearly and permanently excluded from the AIC [Area of Institutional Controls]").  Nonetheless, my colleagues now rule that since the fence was not entirely removed, the February 1994 exclusion was a permanent taking of the entire area including the area that was used by JRS&G until judicial intervention in 1998.

The Court of Federal Claims applied the Court's three-part test of Loretto v. Telepromter Manhattan CATV Corp., 458 U.S. 419, 435 (1982), viz. that a taking occurs only when the property owner has lost the rights to possess, use, and dispose of the property.  See, e.g., Boise Cascase Corp. v. United States, 296 F.3d 1339, 1353 (Fed. Cir. 2002) (applying the Loretto test).  In this case, the Court of Federal Claims found that the three-part test had not been met, except for the permanent wells, because JRS&G retained beneficial use of the property at least until December 1996.  No error has been shown in that analysis.  On that finding, which must be sustained, the statute of limitations cannot have run.

I am concerned that the court's position today brings serious imprecision to takings law.  My colleagues hold that the entire claim is now barred and that irrevocable limitations accrued as to property that JRS&G continued to use during a period for which a Fifth Amendment claim was conspicuously unavailable.  The panel majority cites various actions such as "lawyers' letters" to support its theory that JRS&G had knowledge that a taking had already occurred in February 1994, maj. op. at 24, although the effect of the letters was the removal of the fence.  The question before the Court of Federal Claims was whether a compensable taking occurred in February 1994 as to the property that was restored to use by JRS&G until at least December 1996.  When that court's findings as to the extent of this

05-5033                                                                 6

access and use are reviewed on the appropriate standard of appellate review, the findings must be sustained.

Thus I would affirm the holding of the Court of Federal Claims that the limitations period had not accrued in 1994, and would reach the merits of the takings claim. On the merits, I would affirm that JRS&G is not entitled to compensation for a larger land area than measured by the permit wells, for JRS&G was aware of the landfill when it took the leasehold. I would affirm the Court of Federal Claims on this ground.